**In re Pamela Joyce BRAY, Debtor.**

**No. 06–12148.**

United States Bankruptcy Court,
W.D. Tennessee,
Eastern Division.

April 11, 2007.

Robert B. Vandiver, Jr., Jackson, TN, for Debtor.

## MEMORANDUM OPINION RE: OBJECTION TO CONFIRMATION BY BANK OF GLEASON

G. HARVEY BOSWELL, Bankruptcy Judge.

In the case at bar, the Bank of Gleason, ("The Bank"), filed an objection to confirmation of the debtor's chapter 13 plan on November 7, 2006. The Bank objected to the debtor's plan based on the debtor's proposed bifurcation of its claim. In her chapter 13 plan, the debtor, Pamela Joyce Bray, ("Bray" or "debtor"), proposed to pay the Bank (1) a secured claim of $10,250.00 at 8% interest with a monthly payment of $220.00 and (2) a general unsecured claim of $11,613.61. The Bank objected to this treatment and alleged that

under the "hanging paragraph" of 11 U.S.C. § 1325(a), the debtor was not allowed to bifurcate and strip down the Bank's claim in this manner.

The Court conducted a hearing on the Bank of Gleason's Objection to Confirmation on November 30, 2006. FED. R. BANKR.P. 9014. After statements by counsel, the Court took this matter under advisement and confirmed the debtor's plan without prejudice to this creditor. The parties were then instructed to submit briefs on the issue.

Resolution of this matter is a core proceeding. 28 U.S.C. § 157(b)(2). The Court has reviewed the testimony from the hearing and the record as a whole. This Memorandum Opinion and Order shall serve as the Court's findings of facts and conclusions of law. FED. R. BANKR.P. 7052.

## I. FINDINGS OF FACT

At the hearing on the creditor's objection, the Court requested the parties enter a Stipulation of Facts. The parties entered that stipulation on January 12, 2007. The stipulation provides as follows: [1]

*Secured Note Sequence*

The notes involved in this bankruptcy between the debtor, Pamela Joyce Bray, and the Bank of Gleason began October 11, 2002, when Pamela Bray borrowed $513.50 on an unsecured note which included loan fees. This note is Note No. 17093649 and is attached as Exhibit 1 to [the] stipulation. On November 7, 2002, Pamela Bray came back to the Bank of Gleason and borrowed an additional $1,000.00 and combined this note with the previous note to make Note No. 13093762, a copy of which is attached [to the stipulation] as Exhibit 2. This note matured on November 7, 2003. Ms. Bray came back to the Bank of Gleason

on February 27, 2003, and renewed the previous note and obtained an additional $1,000.00 and incurred additional fees under Note No. 13094598, a copy of which is attached [to the stipulation] as Exhibit 3. This note matured on March 15, 2005. This note was also unsecured as were all previous notes in this line.

On June 24, 2003, Ms. Bray once again came to the Bank of Gleason at which time she executed Note No. 13095564, a copy of which is attached [to the stipulation] as Exhibit 4. She obtained additional funds of $3,438.53 and incurred additional loan fees to bring the total amount financed to $5,662.30. Ms. Bray gave as collateral on this note one (1) used 1998 Chevrolet Cavalier with a Vin # of 1G1JC1242W7306918. This note was for the purpose of refinancing the 1998 Chevrolet Cavalier which had been financed through GMAC. Ms. Bray continued with this note until May 22, 2004, at which time she came back to the Bank of Gleason and executed an additional loan numbered 13098017, a copy of which is attached [to the stipulation] as Exhibit 5. Ms. Bray at this time paid off the previous note and obtained additional funds in the amount of $1,500.00. This note continued to be secured by a 1998 Chevrolet Cavalier and the note indicates that the purpose of this note was for household expenses.

Ms. Bray, once again, came to the Bank of Gleason on November 26, 2004, seeking to renew her previous obligations with the Bank and executed Note No. 13099350, a copy of which is attached [to the stipulation] as Exhibit 6. Ms. Bray obtained additional funds in the amount of $500.00 along with associated fees and continued her pledge of a

---

1. The text of the stipulation is set forth verbatim in this opinion. The exhibits referenced in the stipulation are to the exhibits attached to that stipulation. Those exhibits are not being incorporated into the text of this opinion.

1998 Chevrolet Cavalier as collateral on this note. The note indicates that the purpose of this obligation was for household expenses.

Finally, in this line of loan obligations, Ms. Bray came to the Bank of Gleason on May 23, 2005, at which time she executed loan No. 13100560 in favor of the Bank of Gleason in the total amount of $16, 208.42 to be paid in monthly installments of $330.69 for sixty (60) months. A copy of this note is attached [to the stipulation] as Exhibit 7. Ms. Bray obtained new money in the amount of $11,934.00 and she paid off her previous loan obligation under Note No. 13099350 in the amount of $4,219.42. The purpose of this loan obligation as indicated on the note was to purchase an automobile. This note is secured by a new 2005 Silver Chevrolet Cobalt with a VIN No. of 1G1AK52F757525481. This loan dropped the 1998 Chevrolet Cavalier as collateral and it is assumed that that vehicle was either sold or traded in for the new vehicle.

*Unsecured Note Sequence*

Ms. Bray also had another line of notes which began with Loan No. 13096733, a copy of which is attached [to the stipulation] as Exhibit 8. Ms. Bray borrowed $2,561.23 on an unsecured note which indicated that it was for household expenses. Ms. Bray came back to the Bank of Gleason and renewed her obligation in the prior note in Note No. 13098834 on September 24, 2004, a copy of which is attached [to the stipulation] as Exhibit 9. She obtained new monies in the amount of $1,000.00 and the purpose of this note was indicated to be for purchasing a computer. Ms. Bray returned to the Bank of Gleason on April 26, 2005, and renewed her obligation of the previous note by exe-

cuting Loan No. 13100420 in favor of the Bank of Gleason in the amount of $5,137.14, a copy of which is attached [to the stipulation] as Exhibit 10. She obtained new money in the amount of $2,800.00 at this time and the purpose of the note was the consolidation of debts. Ms. Bray came back to Bank of Gleason on September 30, 2005, at which time she renewed her obligation of the prior note by signing Note No. 13101507 in the amount of $5,920.41, a copy of which is attached [to the stipulation] as Exhibit 11. She obtained new money in the amount of $1,000.00 at this time and the purpose of this note was for household expenses.

*Combination of Both Note Sequences*

Ms. Bray finally came to the Bank of Gleason on March 28, 2006, at which time she combined Note No. 13100560 and Note. No. 13101507 into one (1)note under Loan No. 13102712. A copy of this note is attached [to the stipulation] as Exhibit 12. Ms. Bray did not obtain any new money at this time and the purpose of this note is listed as a consolidation loan. This note is, however, secured by a used 2005 Chevrolet Cobalt VIN No. 1G1AK52F757525481 which was purchased by Ms. Bray with money borrowed from the Bank of Gleason with a purchase money loan. A table listing all of the notes in this matter with the date of the loan and collateral is attached [to the stipulation] as Exhibit 13.

## II. CONCLUSIONS OF LAW

When Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), it amended 11 U.S.C. § 1325(a) to include what is commonly referred to as the "hanging paragraph."[2] This paragraph provides:

---

**2.** The provision is referred to as the "hanging paragraph" because it is an unenumerated paragraph which appears immediately after 1325(a)(9).

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1–year period preceding that filing;

11 U.S.C. § 1325. Prior to enactment of BAPCPA and the addition of the hanging paragraph, debtors were able to use 11 U.S.C. § 506(a) in conjunction with 11 U.S.C. § 1322(b)(2) to bifurcate some secured claims into secured and unsecured portions. Debtors could "strip down" the secured portion of a claim to the value of the collateral. Any amount the debtor owed above and beyond the value of the collateral would be included in the chapter 13 plan as an unsecured claim.

Since the addition of the hanging paragraph in § 1325(a), courts have been faced with the question of whether or not debtors are still able to bifurcate and strip down purchase money secured claims on vehicles bought within 910 days of the filing of the petition. The majority of the Courts interpreting this subsection have concluded that the answer to that question is "no." *In re Montgomery*, 341 B.R. 843, 845 (Bankr.E.D.Ky.2006) *In re Montoya*, 341 B.R. 41, 44 (Bankr.D.Utah 2006); *In re Johnson*, 337 B.R. 269, 272 (Bankr. M.D.N.C.2006); *In re Robinson*, 338 B.R. 70, 73 (Bankr.W.D.Mo.2006); *In re Wright*, 338 B.R. 917, 919–20 (Bankr. M.D.Ala.2006); *In re Scruggs*, 342 B.R. 571, 573 (Bankr.E.D.Ark.2006); *In re Brown*, 339 B.R. 818, 820 (Bankr.S.D.Ga. 2006). In the case of *In re Ross*, 355 B.R. 53 (Bankr.W.D.Tenn.2006), this Court agreed with the majority and held that "debtors may not bifurcate and strip down purchase money secured claims on vehicles bought within 910 days of the filing date. Debtors wishing to retain such vehicles over the objection of the creditor must provide for payment of the entire amount of the creditor's allowed claim." *Id.* at 56–57.

■ In order for § 1325(a)'s hanging paragraph to apply to a case and prohibit a debtor from bifurcating an undersecured claim, four requirements must be met. The proof must show that: "(1) the creditor has a purchase money security interest; (2) the debt was incurred within 910 days preceding the filing of the debtor's case; (3) the collateral for the debt consists of a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor." *In re Graupner*, 356 B.R. 907, 911 (Bankr.M.D.Ga.2006) (citing 11 U.S.C. § 1325(a)'s hanging paragraph). What is at issue in this case is the first prong of the hanging paragraph inquiry, i.e., whether or not the Bank of Gleason has a purchase money security interest that entitles it to anti-bifurcation treatment pursuant to § 1325(a).

■ The terms "purchase money security interest" and its opposite "nonpurchase money security interest" appear several times throughout BAPCPA, *see*, 11 U.S.C. §§ 522, 524, 547 and 1325. Despite its use in various sections, BAPCPA does not define what does or does not qualify as a purchase money security interest. The determination of whether or not a claim qualifies as a purchase money security interest is therefore made by looking to state law. *Graupner*, 356 B.R. at 911, *In re White*, 352 B.R. 633, 638 (Bankr. E.D.La.2006), *In re Cersey*, 321 B.R. 352, 353 (Bankr.M.D.Ga.2004).

## A. Tennessee's Law Regarding "Purchase Money Security Interests"

As the Tennessee Court of Appeals recognized in the case of *Keep Fresh Filters, Inc. v. Reguli,* "[m]otor vehicles are goods for the purpose of Article Nine, and therefore, the Uniform Commercial Code applies to transactions intended to create a security interest in automobiles." 888 S.W.2d 437, 442 (Tenn.Ct.App.1994). Article 9 of the Uniform Commercial Code underwent a major revision in 2001 and Tennessee amended Chapter 9 of T.C.A. Title 47 to reflect this revision. 2000 Tenn. Laws Pub. ch. 846, sec. 2257, § 1 (2000). The effective date of this amendment was July 1, 2001. *Id.*

Tennessee's current statutory definition of a "purchase money security interest" appears in T.C.A. § 47–9–103 and provides in relevant part:

(a) DEFINITIONS. In this section:

(1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

(2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) PURCHASE–MONEY SECURITY INTEREST IN GOODS. A security interest in goods is a purchase-money security interest:

(1) to the extent that the goods are purchase-money collateral with respect to that security interest;

(2) if the security interest is in inventory that is or was purchase-money collateral, also to the extent that the security interest secures a purchase-money obligation incurred with respect to other inventory in which the secured party holds or held a purchase-money security interest; and

(3) also to the extent that the security interest secures a purchase-money obligation incurred with respect to software in which the secured party holds or held a purchase-money security interest.

. . .

(e)(2) In a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation:

(A) the payment must be applied so that the secured party retains no purchase money security interest in any property as to which the secured party has recovered payments aggregating the amount of the sale price including any finance charges attributable thereto; and

(B) for the purposes of this subsection only, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

(f) NO LOSS OF STATUS OF PURCHASE–MONEY SECURITY INTEREST IN NON–CONSUMER–GOODS TRANSACTION. In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if:

(1) the purchase-money collateral also secures an obligation that is not a purchase-money obligation;

(2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or

(3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured.

. . .

(h) NON–CONSUMER GOODS TRANSACTIONS; NO INFERENCE. The limitation of the rules in subsections (e)(1), (f) and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

T.C.A. § 47–9–103. Section 47–9–103 is identical to the Uniform Commercial Code's definition of "purchase money security interest" with the exception of paragraph (e)(2). Uniform Commercial Code § 9–103 does not contain the language found in T.C.A. § 47–9–103(e)(2). In researching this case, the Court could not find any Tennessee cases which have discussed T.C.A. § 47–9–103 or U.C.C. § 9–103 since its revision.[3]

Prior to T.C.A. § 47–9–103's enactment in 2001, Tennessee's statute defining "purchase money security interest" was fairly similar to the present version. The definition appeared at T.C.A. § 47–9–107[4] and, between the years 1963 and 1981, provided that:

A security interest is a "purchase money security interest" to the extent that it is:

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

T.C.A. § 47–9–107 (1963), *repealed by* 2000 Tenn. Laws Pub. ch. 846, sec. 2257, § 1 (2000). The leading case interpreting this version of T.C.A. § 47–9–107 is *Coomer v. Barclays Am. Fin., Inc. (In re Coomer)*, 8 B.R. 351 (Bankr.E.D.Tenn.1980). In that case, the debtor took out a loan from Merit Finance to purchase furniture. Merit loaned the debtor (1) money to purchase the furniture and (2) money to pay off a prior loan the debtor had with Merit. As collateral for the entire loan, Merit took a security interest in the furniture.

■ The issue before the *Coomer* court was whether or not Merit had a purchase money security interest in the furniture sufficient to prohibit the debtor from avoiding the lien under 11 U.S.C. § 522(f). In analyzing the case before it, the court relied heavily on the "to the extent" language of T.C.A. § 47–9–107. The *Coomer* court recognized that some cases had found that if an item of collateral secured anything other than its purchase price, the entire security interest was automatically transformed into nonpurchase money. The *Coomer* court disagreed with this rule because it reasoned that it "ignores the language of the definition which makes a security interest purchase money to the extent the collateral secures its price or purchase money." *Id.* at 353.

In relying on the "to the extent" language of T.C.A. § 47–9–107, the *Coomer*

---

**3.** The Court could only locate one Tennessee case which cites T.C.A. § 47–9–103 in its current version, *In re Jeans*, 326 B.R. 722 (Bankr.W.D.Tenn.2005). In ruling that the debtor's transaction for an automobile gave rise to a preferential transfer under § 547, the *Jeans* court merely set forth T.C.A. § 47–9–103's statutory definition of "purchase money security interest." The court did not discuss § 47–9–103 nor did it analyze the facts of the case pursuant to the section.

**4.** Any and all references to T.C.A. § 47–9–107 in this opinion relate to pre-Article 9–revision T.C.A. § 47–9–107 (1963, 1981) *repealed by* 2000 Tenn. Laws Pub. ch. 846, sec. 2257, § 1 (2000) and not the current statute found at T.C.A. § 47–9–107 which deals with "Control of Letter–of–Credit Right."

court held that a party can have a purchase money security interest in collateral even if that collateral secures more than its purchase price; however, the court found that there were three pre-requisites to finding a purchase money security interest. First, the secured creditor will only be allowed a purchase money security interest to the extent that the collateral secures all or part of its purchase price. Anything over and above the price of the collateral will be held to be nonpurchase money. Second, the contract between the parties must provide for a method of determining the extent of the purchase money security interest. Third, the contract between the parties must provide a method of applying the payments to the purchase money and nonpurchase money parts. *Id.* at 353–54. If the transaction between the parties failed either the second or third prongs of the inquiry, the court would have to find that the creditor's security interest was entirely nonpurchase money.

In drafting its rule, the *Coomer* court reasoned that "[t]he administration of bankruptcy cases demands a workable and clear rule. Without some guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money." *Id.* at 355. The court ultimately found that in the case before it the contract at issue did not provide a method of determining the extent of the purchase money security interest. As a result, the court found that the creditor had an entirely nonpurchase money security interest which the debtor could avoid under § 522(f).

Shortly after the *Coomer* decision, the Bankruptcy Court for the Eastern District of Tennessee issued an exception to the general rule set forth in *Coomer.* In *Slay v. Pioneer Credit Co. (In re Slay)*, 8 B.R. 355 (Bankr.E.D.Tenn.1980), the debtors

obtained a loan for appliances and furniture in 1979. The creditor retained a security interest in the goods as collateral. A little over a year later, the debtors took out a second loan with the creditor. This second loan paid off the first note and advanced some additional cash to the debtors. The creditor retained the security interest from the first note as collateral for the second one. The debtors did not make any payments on the second note prior to filing for bankruptcy relief.

In looking at the case before it, the *Slay* court reiterated the general rule from *Coomer* which stated that if "there is no method of apportioning the loan between the purchase money and nonpurchase money [portions] and no method of applying the payments to the parts" the creditor will lose its purchase money status. 8 B.R. at 358. Because the loan documents in the *Slay* case did not provide a method of apportioning the purchase money and nonpurchase money portions, the court preliminarily found that the creditor would not be entitled to a purchase money security interest under the general *Coomer* rule; however, the fact that the debtors had not made any payments on the second loan led the *Slay* court to create an exception to the general rule. In a case where the debtor has not made any payments on a loan after it is consolidated, "[t]he court can easily determine the amount of the purchase money debt. It is what they owed on it at the time of the consolidation." *Slay,* 8 B.R. at 358.

In 1981, the Tennessee legislature added a third subsection to T.C.A. § 47–9–107 to include within the definition of "purchase money security interest:"

(c) under subsections (a) and (b), a purchase money security interest upon any unpaid balance in preexisting collateral arising pursuant to a series of purchases or extension of payment time and terms.

Provided, however, that whenever the collateral is consumer goods, the creditor retains no purchase money security interest in any property as to which he has received payments aggregating the amount of the sale price including any finance charges attributable thereto. For the purposes of this section, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

T.C.A. § 47–9–107(c) (1963, 1981), *repealed by* 2000 Tenn. Laws Pub. ch. 846, sec. 2257, § 1 (2000). This subsection codified what was commonly referred to as the first-in/first-out rule. There is only one published Tennessee decision which discusses § 47–9–107(c), *In re Nolen*, 53 B.R. 235 (Bankr.M.D.Tenn.1985). In *Nolen*, the debtor made a series of purchases from Tiller Furniture Company for a freezer, a refrigerator, a heater, an air conditioner, a sleeper chair and a washer. With each transaction, the debtor borrowed money from Tiller and signed an identical security agreement. The agreement contained a clause which stated that any future purchases would be added to and form a part of the original contract and that Tiller had the option of pro-rating payments made on the contracts between the separate purchases. The debtor made a total of $1,557.00 in payments on the furniture and appliances

Upon filing for bankruptcy relief, the debtor included Tiller in his plan as secured for only one item. Tiller objected to confirmation and alleged that it was entitled to a purchase money security interest in each of the six items the debtor had purchased. The court held that the merg-

ing of the separate contracts destroyed Tiller's purchase money security interest and overruled Tiller's objection to confirmation. Shortly thereafter, Tiller filed a motion for reconsideration of the court's ruling. After the hearing on Tiller's motion, the court reversed its earlier decision and found that Tiller was entitled to a full purchase money security interest in the air conditioner, sleeper recliner and washer and a partial purchase money security interest in the refrigerator.[5]

In analyzing the case before it, the *Nolen* court set forth a good summary of the problems courts were having with determining whether or not creditors had a purchase money security interest when an item secured not only its purchase price but the purchase price of other items. *Id.* at 236–37. Courts had developed two different rules for determining whether or not a purchase money security interest existed when separate loans were consolidated into one. The first rule, known as the "transformation rule," held that when an item secured more than its purchase price, the entire purchase money security interest was destroyed. *Id.* at 237. The second rule, known as the "dual-status" approach, held that "the presence of a non-purchase money security interest in collateral does not destroy the previously-obtained purchase money security interest." *Id.* Instead, the dual-status rule allowed a court to find a purchase money security interest " 'to the extent' that it was taken or retained by the seller to secure all or part of its price.' " *Id.* Typically, cases employing the "dual status" approach required either a statutory or contractual method of apportioning the extent of the purchase money security interest. Other times, court imposed a judicial "first-in

---

5. In granting Tiller's motion for reconsideration, the *Nolen* court never mentions the heater the debtor purchased from Tiller. The ledger sheet introduced into evidence by Tiller and set forth in the opinion also does not show the heater.

first-out" rule. *Pristas v. Landaus of Plymouth, Inc.,* 742 F.2d 797, 801 (3rd Cir.1984)

By virtue of adding subsection (c) to T.C.A. § 47–9–407, the Tennessee legislature issued a statutory guideline for courts to use in determining the extent of a creditor's purchase money security interest when the contracts between the parties did not provide such a method. Using this statutory first-in/first-out rule, the *Nolen* court determined that the debtor had paid in full for the freezer and only owed $535.60 on the refrigerator. The debtor had not paid for any other items. As a result, the court found that the creditor held a full purchase money security interest in the air conditioner, sleeper recliner, and washer and a partial purchase money security interest in the refrigerator to the extent of $535.60.

Upon a preliminary reading of T.C.A. § 47–9–103(e)(2), it appears that the Tennessee legislature intended for courts to continue to use the first-in/first-out rule set forth in repealed T.C.A. § 47–9–107(c) and adopted in *Nolen* in all purchase money transactions; however, when a court attempts to analyze a loan consolidation under subsection (e)(2)'s first-in/first-out rule, it becomes apparent that the first-in/first-out rule cannot be applied to cases in which secured debt is consolidated with unsecured debt.

Clearly when a party consolidates notes like the ones at issue in *In re Nolen,* T.C.A. § 47–9–103(e)(2)'s guidelines are workable. A series of transactions in which a party purchases numerous pieces of collateral from one seller (or a party finances the purchase of numerous pieces of collateral with one lender) can easily be sorted out using the first-in/first-out rule.[6]

All payments made under such notes are payments on collateral. The payments can be easily allocated between the first purchased piece of collateral and the next, or the cheapest piece of collateral and the next, etc. When the parties consolidate secured and unsecured notes, however, subsection (e)(2) does nothing but leave courts with unanswered questions. Are payments the debtor made on the loan applied to the secured portion of the debt or the unsecured portion? Does it matter in what order the debtor borrowed the money, i.e. unsecured money first or secured? Does the purchase money interest carry through on the consolidation or does it disappear?

For purposes of a very basic example of how this first-in/first-out rule could work to the detriment of a legitimate purchase money secured creditor, imagine the following scenario. Over the course of five years, a debtor borrows $13,000.00 and pays back $12,000.00 worth of unsecured credit to the same lender. Each time the debtor borrows the money, the bank renews the old note and advances (1) an amount to payoff the previous note and (2) a new sum of money to the debtor. Five years after the debtor obtains the first unsecured note, the debtor finances the purchase of a car for $12,000.00 with the same creditor. In loaning the debtor money for this car, the bank renews the previous unsecured note and advances (1) the $12,000 for the car and (2) an amount sufficient to payoff the balance of the unsecured note. The secured creditor takes a purchase money security interest in the car as collateral.

The debtor makes payments on the new note for a year and then files for bank-

---

**6.** Although the first-in/first-out rule can be applied easily, its one fault is that it does not seem to take into consideration any finance rate or interest charges when determining what has been paid for. Since the Court is declining to use the first-in/first-out rule in this case, though, the Court will not address this deficiency.

ruptcy protection. When the debtor files his chapter 13 plan, he bifurcates the creditor's loan into secured and unsecured portions. The creditor objects. At the confirmation hearing, the court applies the first-in/first-out rule to the situation and determines that the debtor has paid a total of $13,000 to the creditor over the life span of the loan and that, in accordance with T.C.A. § 47–9–103(e)(2)'s first-in/first-out rule, the debtor has wholly paid for the car and, therefore, the creditor has no purchase money security interest in the vehicle. Clearly, this would be an absurd result and not one which the legislature intended.

 The more appropriate rule to use in cases of the consolidation of unsecured and secured notes is the one announced in *In re Coomer* and *In re Slay:*

(1) a secured creditor will have a purchase money security interest to the extent that the collateral secures all or part of its price; so long as

(2) the contract between the parties provides for a method of determining the extent of the security interest and a method for apportioning the payments.

*Coomer*, 8 B.R. at 353–54; *Slay*, 8 B.R. at 358. If the debtor has not made any payments on the note, then a court may employ the *Slay* exception to find that the purchase money portion of the debt is the amount owed at the time of consolidation. *Slay*, 8 B.R. at 358. Because the Tennessee statutes offer courts no guidance on how to determine the extent of a purchase money security interest, it is essential to situations wherein parties consolidate secured and unsecured notes that the loan documents or contracts set forth a method for (1) apportioning the extent of the purchase money security interest and (2) allocating payments among the various parts of a loan. As the court in *Coomer* recognized, "a court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money." *Coomer*, 8 B.R. at 355. The transactions between the parties in the case at bar proves the soundness of the *Coomer* court's reasoning.

**B. Does the Bank of Gleason have a purchase money security interest in this case?**

 Under the dual-status approach, the Court must engage in a two-step process when determining whether or not the Bank has a purchase money security interest in this case. First, the Court must determine whether or not the Bank has an interest which can qualify as a purchase money security interest as defined in T.C.A. § 47–9–103. If the Court finds that the Bank does have a purchase money security interest, it must then determine the extent of the Bank's interest using the *Coomer* and *Slay* rules.

In the case at bar, the determination of whether or not the Bank holds a purchase money security interest is complicated by the nature of the transactions between the parties. While it is true that there was only one outstanding loan at the time debtor filed her case, the Court must review the entire sequence of notes between the parties to determine whether or not the Bank had a purchase money security interest which prohibits the debtor from bifurcating the Bank's interest. This thorough review is necessary because the last note, loan number 13102712, was a mere consolidation of all the previous notes.

From reviewing the loan documents in this case, it appears to the Court that the Bank did at one time have a purchase money security interest in the vehicles; however, this purchase money interest ebbed and flowed over the course of the relationship between the parties and was eventually extinguished by the time the debtor filed her bankruptcy petition. The Court is basing its decision on two factors.

First, neither the renewals nor the consolidation fit squarely within the statutory definition of "purchase money security interest." Second, the loan documents in this case do not provide a method of apportioning the purchase money and non-purchase money portions of the loan nor do they provide an allocation method for the payments.

As stated supra, Tennessee's definition of "purchase money security interest" requires (1) an obligation to be "incurred as all or part of the price of the collateral" or (2) for the loan proceeds to "enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." T.C.A. § 47–9–103(a). Clearly, when the debtor purchased the 1998 Cavalier in June 2003, (loan number 13095564, "fourth note"), the Bank had a purchase money security interest in the car. The debtor used the proceeds of the loan to acquire the 1998 Cavalier. That fits squarely within the "purchase money" definition; however, under the dual-status rule, the Bank only had a purchase money interest to the extent of $3,438.53. The other $2,085.79 the Bank lent to the debtor to payoff the previous unsecured note (loan number 13094598, "third note") would not be included in the purchase money portion of the Bank's security interest. That portion of the loan was not incurred by the debtor as part of the purchase price of the car nor did it enable the debtor to acquire any rights in the car.

The Bank renewed the fourth note in May 2004 (loan number 13098017, "fifth note") when it lent the debtor $3,659.11 to payoff the fourth note and $1,500.00 in new money. The 1998 Cavalier continued to serve as collateral for the renewed note. The first problem with this fifth note is that the debtor did not use the proceeds of this loan to acquire any rights in the car that she did not already have. Any and all rights she had in the 1998 Cavalier were acquired when she purchased the car in June 2003. Secondly, the debtor had paid approximately $2,000.00 on the fourth note before it was renewed in May 2004. The loan documents for the fourth note do not provide a method of allocating the payments between the purchase money and nonpurchase money portions of the fourth note. Because the parties did not provide an allocation method, the Court has no way of determining the extent of the Bank's purchase money interest that carried through to the fifth note.

When the fifth note was renewed in November 2004, (loan number 13099350, "sixth note"), the same problem arose. First, the debtor did not use the proceeds of the loan to acquire any rights in the 1998 Cavalier that she did not already have. Secondly, the debtor had paid over $1,000.00 towards the fifth note before the Bank renewed it. Once again, the loan documents did not provide any method of allocating the payments between the purchase money and nonpurchase money portions of the loan so there is no way for the Court to determine the extent of the Bank's purchase money interest.

The last transaction in the "secured note sequence" established a new purchase money security interest in the 2005 Chevy Cobalt, (loan number 13100560, "seventh note"); however, it is unclear what the extent of the Bank's purchase money interest in the 2005 Cobalt was. According to the loan documents, the debtor had not paid off the 1998 Chevy Cavalier at the time of incurring the seventh note. There was still an outstanding balance of $4,219.42 on that note when the debtor borrowed the money for the new Cobalt. As previously stated by the Court, the parties' failure to state an allocation method for the loan payments makes it impossible for the Court to determine what portion of the sixth note's outstanding balance

represented purchase money debt and which portion represented non-purchase money debt. It is clear, however, that because the debtor did not pledge the 1998 Cavalier as collateral for the seventh note, the negative equity in the Cavalier was financed in the loan for the 2005 Cobalt.

■ When negative equity is financed in with a new transaction, courts typically find that the negative equity is not included within a party's purchase money security interest for purposes of 11 U.S.C. § 1325(a)'s hanging paragraph. *In re Westfall,* 365 B.R. 755, 764, 2007 WL 981730 *9 (Bankr.N.D.Ohio 2007); *In re Price,* 363 B.R. 734, 741 (Bankr.E.D.N.C. 2007) ("Providing a loan to allow a debtor to pay off the lien on a trade-in to the extent that there is negative equity, and then rolling-in and refinancing that loan in the replacement vehicle acquisition transaction is not value used to acquire rights in or the use of the replacement vehicle....").[7] The Court finds this to be a sound decision and rules that that portion of the debt which represented the negative equity in the 1998 Cavalier would not be included in the Bank's purchase money security interest. Had the parties not entered into any subsequent loans, and had the debtor not made any payments on the seventh note, the Court could easily determine that the Bank had a purchase money security interest in the 2005 Chevy Cobalt and the Court could easily determine the extent of the Bank's purchase money interest; however, the renewal of the seventh note on March 28, 2006, defeated this purchase money interest.

The second basis for the Court's decision that the Bank did not have a purchase money security interest at the time the debtor filed this case is that the loan documents do not provide a method for (1) apportioning the amount of the debt between the purchase money and nonpurchase money portions or (2) allocating the payments to the different portions of the loan. Each time the Bank lent Bray money she made payments on that note up until the time the note was renewed. Starting with the first loan for the 1998 Cavalier, the Bank lent the debtor $3,438.53 to purchase the vehicle and $2,085.79 to payoff the previous unsecured note for a total amount of $5,524.31 (the first loan for the 1998 Cavalier was entered into on June 24, 2003, and will be referred to as "fourth note"). The debtor made payments on this loan for almost a year before the note was renewed in May 2004. When the note was renewed (under the "fifth note"), the payoff of the fourth note was $3,659.11. This means that the debtor paid approximately $1,800.00 towards the fourth note's balance before it was renewed.

Because the loan documents in this matter did not set forth a method of apportioning the payments between the secured and unsecured portions, there is no way for the Court to determine how much of the Bank's purchase money security interest carried over into the fifth note. This problem occurred when the Bank renewed the fifth note in November 2004 and the sixth note in May 2005. When the fifth note was renewed in November 2004, the payoff was $4,228.33, evidencing that the debtor had paid a little over $1,000.00 towards the fifth note's balance. When the sixth note was renewed in May 2005, the payoff was $4,219.42 which means that the debtor had paid approximately $600.00 pri-

---

7. It is unnecessary for the Court to address the negative equity. In the case at bar, the Court finds that the Bank does not have a purchase money security interest based on the fact (1) that the purchase money loan was consolidated with a nonpurchase money one and (2) that the parties did not provide a method of apportioning the loans and payments, it is unnecessary for the Court to address the negative equity issue.

or to its renewal. There was nothing in the loan documents which dictate how to apply the loan payments that were made. Were they all applied to the nonpurchase money portion of the loans? Or were they applied to the purchase money portion? What percentage of the payments were for finance charges or interest charges? There is simply no way for the Court to answer these questions in this case.

When the debtor consolidated the secured note sequence with the wholly unsecured note sequence on March 28, 2006, she borrowed $20,897.99 from the Bank. She used that money to (1) payoff the "secured note sequence" (ultimately secured by the cars) in the amount of $15,321.73 and (2) payoff the "unsecured note sequence" in the amount of $5,421.26. By looking at the payoff amounts in comparison to the original loan amounts, it appears that the debtor paid a total of $7,421.83 over the course of her relationship with the Bank. The Court has no way of determining how these payments were applied though and so there is no way to determine the extent of the Bank's purchase money security interest. The parties did not provide an allocation method for the payments made and, as stated infra, the first-in/first-out rule of T.C.A. § 47–9–103(e)(2) is unusable in this case.

Based on the reasoning of *In re Coomer* and the statutory definition found in T.C.A. § 47–9–103, the Court finds that the Bank of Gleason does not have a purchase money security interest in this case. As a result, the hanging paragraph of 11 U.S.C. § 1325(a) does not prevent the debtor from bifurcating the Bank's claim into secured and unsecured portions. The Bank's Objection to Confirmation will be overruled and the debtor's plan will be confirmed as to the Bank of Gleason.

## III. ORDER

It is therefore **ORDERED** that the Bank of Gleason's Objection to Confirmation is hereby **OVERRULED**.

**IT IS SO ORDERED.**