**In re James J. AUSTIN, and Nicole M. Austin, Debtors.**

No. 07C–22771.

United States Bankruptcy Court, D. Utah.

Feb. 12, 2008.

Lee J. Davis, Law Office of Davis & Jones, PC, Salt Lake City, UT, for Debtors.

GLEN E. CLARK, Chief Judge.

This matter came before the court on the 6th Day of November, 2007 on the objection of James J. Austin and Nicole M. Austin ("Debtors") to proof of claim # 27 filed by Zions First National Bank ("Zions"). Lee J. Davis of Davis & Jones, P.C. appeared on behalf of the Debtors and Kami L. Peterson appeared on behalf of Zions.

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## BACKGROUND

On November 1, 2005, the Debtors purchased a 2005 Dodge Grand Caravan (the "Van") using Zions to finance the purchase. The cash sale price of the Van was $23,998.96. In conjunction with the purchase, the Debtors traded in a 1999 Pontiac ("Pontiac") for which they were given a $2,500.00 trade-in allowance, and for which they still owed $5,500.00. The $5,500.00 owed by the Debtors on the Pontiac was rolled-over into the financing of the Van. The net effect of trading in the Pontiac resulted in Zions rolling $3,000.00 of negative equity into the Van's financing. With the roll-over of debt owed on the Pontiac plus other fees, the total amount financed by Zions was $27,968.46 [1].

The Debtors admit that the Van was purchased within 910 days of their bankruptcy, that the Van was purchased for the Debtors' personal use, and that Zions has a perfected security interest in the Van. The Debtors do not dispute that the amount advanced by Zions to cover the actual purchase price of the Van qualifies as a purchase money obligation. At the hearing, Zions put on the testimony of Michelle Hamilton (Hamilton), a Vice-President of Zions Bank and a manager of Zions' Dealer Loan Center. Hamilton testified that the Debtors would not have qualified for financing on the Van unless the Debtors traded in their Pontiac, and that Zions would not have agreed to finance the Van unless the Debtors agreed to finance the negative equity of $3,000.00 from the trade-in. Hamilton testified that Zions requires the financing of negative equity from trade-ins because, under Zions' loan criteria, if there is only one buyer, Zions will finance only one vehicle. Had the Debtors not traded in the Pontiac, the Debtors would be obligated to continue making monthly payments on the Pontiac as well as make monthly payments on the Van, which is something that the Debtors could not afford at that time. Hamilton also testified that had the Debtors surrendered the Pontiac to the original secured party without paying the balance owed, or had the Pontiac been repossessed by the original secured party, Zions would have refused to finance because the Debtors would have been viewed as a credit risk.

## ANALYSIS

Section 1325(a)(9) of the United States Bankruptcy Code (the "Code") contains a hanging paragraph (the "Hanging Para-

---

1. The Court notes that Zions does not claim purchase money interest status for the $495.00 advanced by Zions for "gap insurance."

graph") that operates to prevent certain purchase money security interest claims from being bifurcated pursuant to § 506 of the Code. The Debtors argue that the Hanging Paragraph does not apply to Zions' entire claim because the negative equity financed by Zions from the trade in of the Pontiac does not qualify as purchase money security interest financing.

The Hanging Paragraph, according to the Debtors, is unambiguous and should be read literally and narrowly to not apply in those situations where a creditor rolls-over an existing loan into a new transaction. Debtors argue that because the words "purchase money security interest" found in the Hanging Paragraph are not modified by words such as "to the extent" or "any portion" the term "purchase money security interest" found in the Hanging Paragraph should be construed to include only debt that is a part of the collateral's purchase price.

■ The Bankruptcy Code does not define "purchase money security interest." Rather than accept the Debtors' invitation to define the term "purchase money security interest" for the purposes of the "hanging paragraph," the Court will instead look to state law[2]. Utah Code Annotated defines a purchase money security interest as follows:

(1) In this section:

(a) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

(b) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the

use of the collateral if the value is in fact so used.

(2) A security interest in goods is a purchase-money security interest:

(a) to the extent that the goods are purchase-money collateral with respect to the security interest; ...

Utah Code Annotated § 70A–9a–103.

The issue to be determined by the Court is whether the negative equity financing provided by Zions to the Debtors qualifies as a "purchase-money obligation" with respect to the purchase of the Van, a consumer-goods transaction. Utah Code Annotated § 70A–9a–103(6)(a) provides that in the case of transactions other than a consumer-goods transaction, purchase-money collateral may also secure an obligation that is not a purchase-money obligation. Citing to this subsection, the Debtors argue that Utah law does not provide the same safe harbor for a consumer-goods transaction and the Court should recognize the distinction as grounds to find that negative equity financing does not qualify as a purchase money obligation with respect to a consumer-goods transaction.

■ Where particular language is found in one section of a statute but omitted in another section of the same statute, it is generally presumed that the disparate inclusion or exclusion was intentional and purposeful. *Field v. Mans,* 516 U.S. 59, 67, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995). With nothing more, the Court would be guided by the rule of statutory interpretation described in *Field* to infer that the Utah legislature intended for the opposite to occur with respect to consumer-goods transactions and that negative equity financing does not qualify as a pur-

**2.** For the definition of the term "purchase money security interest," courts uniformly look to the law of the state in which the financing took place. *Billings v. Avco Colorado Industrial Bank,* 838 F.2d 405, 406 (10th Cir.1988).

chase money obligation with respect to a consumer-goods transaction. Such an inference would be a mistake. Utah Code Annotated § 70A–9a–103(8) specifically forbids the court from making such an inference. It leaves the task of determining the proper rules with respect to consumer-goods transactions for the courts, and directs the courts to continue to apply established approaches, stating that:

> (8) The limitation of the rules in Subsections (5), (6), and (7) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

Utah Code Annotated § 70A–9a–103(8).

Given the definition of a purchase money obligation under the Utah Code, Zions' financing may qualify as purchase money financing in one of two ways: 1) if Zions' negative equity financing was a "part of the price of the collateral" or 2) if Zions' negative equity financing was "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Neither party argues that Zions' negative equity financing was a part of the purchase price of the Van, so the Court is left with the sole question of determining whether Zions' negative equity financing constituted "value given to enable the debtor to acquire rights in or the use of the collateral," and if the value was in fact so used.

▇▇▇ When a federal court is called upon to interpret state law, the federal court must look to the rulings of the highest state court, and if no such rulings exist, it must endeavor to predict how that high court would rule. The decision of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Stickley v. State Farm Mutual Automobile Insurance Co.*, 505 F.3d 1070, 1077 (10th Cir.2007).

While this Court is unaware of any Utah State Supreme Court rulings on point, it is aware of two rulings which merit consideration. The first ruling, *Lewiston State Bank v. Greenline Equipment, L.L.C.*, 147 P.3d 951 (Utah Ct.App.2006), is a Utah Court of Appeals opinion which denied purchase money security interest status to a refinance lender. The court in *Lewiston* relied upon two important facts: 1) the refinance that took place in *Lewiston* was a two-step process involving a significant gap of time between the payoff of the original purchase money lender and the extension of credit by the subsequent lender who sought purchase money lender status, and 2) the purchase money lien held by the original lender was extinguished during the gap of time between the payoff and the extension of credit by the subsequent lender.

The second ruling, *Harper v. Wilserv Credit Union*, 516 F.3d 1180, 2008 WL 192862 (10th Cir.2008), denied purchase money security interest status to a lender who refinanced a loan in the amount of the purchase price of the vehicle plus the filing fee. The refinance lender was apparently denied purchase money security interest status for two reasons: 1) the loan was made slightly more than six weeks after the original loan, and 2) as stated by the Tenth Circuit:

> We think it plain that the credit union loan did not in fact enable the debtors to acquire rights in the truck even under the most liberal view. The credit union is an entirely different lender than the finance company, and the credit union

proceeds went to the debtors who then chose to pay off the finance company. The credit union does not have a PMSI and cannot rely on automatic perfection. *Id.* at 1188, 2008 WL 192862 *7.

 Both *Lewiston* and *Harper* are distinguishable from the facts of the case at hand. The undisputed facts before the Court are that: 1) Zions' financing of the negative equity was necessary in order for the Debtors to financially qualify for the loan, 2) Zions' negative equity financing was necessary for the Debtors to acquire rights in and use of the Van, 3) if Debtors had not financially qualified for the loan, the sale would not have occurred, and 4) the negative equity financing provided by Zions' was in fact used by the Debtors in conjunction with the purchase of the Van.

 Given the undisputed evidence before the Court, the $3,000.00 of negative equity financed by Zions was "value given" by Zions which was "in fact so used" during the course of a transaction to "enable the debtor[s] to acquire rights in or the use of the collateral." Put together, the $3,000.00 negative equity financing, and the balance[3] of the financing provided by Zions meets the requirements set forth in Utah Code Annotated § 70A–9a–103(1)(b) of a purchase-money obligation. The Court finds that Zions' claim, less that amount extended by Zions for "gap insurance," qualifies as a purchase money obligation[4], and that because Zions' claim qualifies as a purchase money obligation, the "hanging paragraph" of § 1325(a) insulates Zions' claim from bifurcation under § 506 of the Code.

**3.** Less the $495.00 provided by Zions for "gap insurance."

**4.** This ruling may be viewed by bankruptcy practitioners as a "two edged sword." A debtor who wishes to retain possession of a 910 vehicle purchased with negative equity

This holding is consistent with the persuasive and well reasoned opinion *In re Burt,* 378 B.R. 352 (Bankr.D.Utah 2007)(J. Thurman), which likewise finds that negative equity financing, when necessarily incurred in conjunction with a vehicle purchase, qualifies as a purchase money obligation under Utah law.

Based upon the above, it is hereby

ORDERED that Debtors' objection to Zions' Proof of Claim # 27 is DENIED, and it is further

ORDERED that Zions' claim # 27 is not subject to cramdown or other reduction.

financing may not bifurcate and cramdown the creditor's claim. On the other hand, a debtor who wishes to surrender a 910 vehicle that was purchased with negative equity financing may surrender the vehicle in full satisfaction of the debt. *In re Quick,* 371 B.R. 459 (10th Cir. BAP 2007).