In re John Wesley FORD, Sr., Cynthia Dawn Ford, Debtors.

No. 07–11561.

United States Bankruptcy Court, D. Kansas.

May 8, 2008.

Michael J. Studtmann, Wichita, KS, for Debtors.

## MEMORANDUM OPINION

ROBERT E. NUGENT, Chief Judge.

Before the Court today is the Chapter 13 plan of the debtors and the objection of Ford Motor Credit Corporation (FMCC) to its confirmation.[1] Debtors appear by their attorney Michael J. Studtmann. FMCC appears by its attorney Thomas J. Lasater. In their plan, the debtors propose to reduce the amount of their debt to FMCC by $7,200, notwithstanding that they incurred the debt, secured by a vehicle, within 910 days of their bankruptcy petition. FMCC objects that this treatment impairs its rights under the notorious "hanging paragraph" created by BAPCPA,[2] 11 U.S.C. § 1325(a)(*), found immediately below § 1325(a)(9), but not numbered or designated as a subsection.[3]

*Factual Setting*

Although the parties have provided no set of stipulated facts, the Court gleans from the retail installment contract executed by debtors, the parties' memoranda, and its reading of the debtors' plan that there are no factual disputes.[4] Debtors acquired a Ford pickup truck from Rusty

---

1. Dkt. 2 and Dkt. 14.

2. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. § 101 et seq. Unless otherwise indicated all statutory references are to the Bankruptcy Code as amended by BAPCPA.

3. The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (L) and § 1334.

4. At the October 25, 2007 scheduling conference, the parties advised the Court that they "agreed to stipulate" and the Court set a briefing schedule. Dkt. 27. No written stipulations of fact were subsequently presented by the parties but neither party requested an evidentiary hearing either. No exhibits were offered with the parties' memoranda, but attached to FMCC's confirmation objection is the Kansas Simple Interest Vehicle Retail Installment Contract debtors executed with Rusty Eck which lays out the essentials of the

Eck Ford in Wichita, Kansas within 910 days of their filing. According to FMCC's objection to confirmation, they borrowed nearly $40,000 to buy the pickup and, according to the disclosure statement contained in the retail sales contract between Rusty Eck and the debtors, the cash price of the vehicle was $29,975 and the debtors paid $1,500 as a cash down payment.[5] Eck also advanced funds to pay a GAP insurance policy premium, an administrative fee, and the sum of $7,200 payable to Central Star Credit Union, which held the lien on debtors' trade-in vehicle.[6] This latter amount was the difference between the value of the debtors' trade-in vehicle ($16,300) and the debt remaining on it ($23,500), the so-called "negative equity."[7] Rusty Eck Ford assigned the retail sales contract to FMCC. The debtors' plan bifurcates FMCC's claim by treating the negative equity portion as unsecured.[8] FMCC protests that this bifurcation of its claim denies it the protection of the hanging paragraph and offers this Court the opportunity to weigh-in on the much disputed negative equity question.

*Conclusions of Law*

The hanging paragraph provides that § 506 shall not apply to a debt incurred within 910 days of the petition date and secured by a purchase money security interest taken in a vehicle.[9] In broad terms, this means that debtors may not cram down so-called "910–car loans" to the value of the vehicle as previously permitted. Under pre-BAPCPA § 1325(a)(5)(B), a creditor's allowed secured claim, secured by the vehicle, was only allowed to the extent of the creditor's interest in the estate's interest in the vehicle.[10] By excising 910–car loans from the class of secured claims that are "allowed" under § 506, Congress required debtors who purchased vehicles within 910 days of filing to pay their lenders the contract price without regard to the vehicle's actual value.[11] The hanging paragraph makes this protection only applicable to such loans secured by a "purchase money security interest" in vehicles acquired by the debtor for "personal use." There is no dispute here that the vehicle was acquired within the 910–day period and that it was acquired for person-

credit transaction described in this opinion. *See* Dkt. 14, Attachment 1. Debtors do not contest any of the facts represented by FMCC in its memoranda that are not apparent from the Contract. For example, debtors do not dispute FMCC's claim that the Contract was assigned to FMCC. Dkt. 44, p. 1. Nor do debtors dispute FMCC's contention that without the financing of negative equity on debtors' trade-in, the debtors could not have purchased the pickup. Dkt. 44, p. 15.

5. Dkt. 14, Attachment 1.

6. *Id.*

7. *Id.*

8. Dkt. 2.

9. Section 506(a)(1) permits bifurcation of a creditor's allowed claim into secured and unsecured claims: "An allowed claim of a creditor secured by a lien on property in

which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim."

10. *See* § 506(a).

11. *See In re Vega,* 344 B.R. 616, 620 (Bankr. D.Kan.2006); *In re Montoya,* 341 B.R. 41, 43–44 (Bankr.D.Utah 2006); *Capital One Auto Finance v. Osborn,* 515 F.3d 817, 820–21 (8th Cir.2008) (if debtors choose to retain the vehicle they must pay the entire amount of the debt); *In re Weiser,* 381 B.R. 263, 266 (Bankr. W.D.Mo.2007) (if creditor fits within the hanging paragraph, the Code's bifurcation provision does not apply and the creditor has secured claim for the full amount due as of the date of filing, regardless of the value of its collateral).

al use of the debtors. The Court must determine whether and to what extent FMCC has a purchase money security interest ("PMSI") in the truck. More specifically, this case presents the question of whether the creditor's PMSI secures the financed negative equity used to pay off the debt against debtors' trade-in vehicle.

■ The Court is aware that, as of this writing, this issue is before the Tenth Circuit Court of Appeals [12] and that a number of bankruptcy and district courts around the country have opined on this point. No other Circuit Court authority has been made known to the Court. At present, the courts are fairly evenly split between holding for the creditors [13] and holding for the debtors.[14] In particular, the Court also observes that one district judge and two bankruptcy judges in this District have held that negative equity is not secured by a PMSI when applying the hanging paragraph.[15] This Court respectfully disagrees.

■ Because "purchase money security interest" is not a term defined in the bankruptcy code, courts grappling with this issue should look to applicable state law to determine whether the secured transaction in question is a PMSI.[16] We therefore turn

12. *Wells Fargo Bank, N.A. v. Hunt (In re Hunt)*, No. 07–3297 (10th Cir.), appealing Kansas Bankruptcy Judge Berger's order denying Wells Fargo's objection to confirmation of the chapter 13 plan, No. 07–20627 (Bankr. D.Kan. Aug. 13, 2007). The bankruptcy court held, applying Missouri law where the contract was entered into, the hanging paragraph did not apply reasoning that, under Missouri law, the transformation rule stripped the transaction of purchase money status. *But see In re Weiser*, 381 B.R. 263 (Bankr. W.D.Mo.2007) (applying Missouri law).

13. Courts holding that financed negative equity on trade-in vehicle is part of the PMSI and subject to hanging paragraph: *General Motors Acceptance Corp. v. Peaslee (In re Peaslee)*, 373 B.R. 252 (W.D.N.Y.2007), *reversing In re Peaslee*, 358 B.R. 545 (Bankr.W.D.N.Y.2006); *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 2007 WL 1858291 (M.D.Ga.2007), *affirming In re Graupner*, 356 B.R. 907 (Bankr. M.D.Ga.2006); *In re Austin*, 381 B.R. 892 (Bankr.D.Utah 2008); *In re Dunlap*, 383 B.R. 113 (Bankr.E.D.Wis.2008); *In re Schwalm*, 380 B.R. 630 (Bankr.M.D.Fla.2008); *In re Weiser*, 381 B.R. 263 (Bankr.W.D.Mo.2007); *In re Brei*, 2007 WL 4104884 (Bankr.D.Ariz. 2007); *In re Burt*, 378 B.R. 352 (Bankr. D.Utah 2007); *In re Wall*, 376 B.R. 769 (Bankr.W.D.N.C.2007); *In re Cohrs*, 373 B.R. 107 (Bankr.E.D.Cal.2007); *In re Petrocci*, 370 B.R. 489 (Bankr.N.D.N.Y.2007); and *In re Stevens*, 368 B.R. 5 (Bankr.D.Neb.2007).

14. Courts holding that financed negative equity on trade-in vehicle is not a PMSI and that the negative equity is not subject to hanging paragraph: *In re Look*, 383 B.R. 210 (Bankr. D.Me.2008); *In re Wear*, 2008 WL 217172 (Bankr.W.D.Wash.2008); *In re Johnson*, 380 B.R. 236 (Bankr.D.Or.2007); *In re Tuck*, 2007 WL 4365456 (Bankr.M.D.Ala. Dec. 10, 2007); *In re Lavigne*, 2007 WL 3469454 (Bankr. E.D.Va. Nov.14, 2007); *In re Conyers*, 379 B.R. 576 (Bankr.M.D.N.C.2007); *In re Hayes*, 376 B.R. 655 (Bankr.M.D.Tenn.2007); *In re Sanders*, 377 B.R. 836 (Bankr.W.D.Tex.2007); *In re Westfall*, 376 B.R. 210 (applying a "federal understanding" of the term purchase money security interest) and 365 B.R. 755 (Bankr.N.D.Ohio 2007); *In re Blakeslee*, 377 B.R. 724 (Bankr.M.D.Fla.2007); *In re Pajot*, 371 B.R. 139 (Bankr.E.D.Va.2007); *In re Acaya*, 369 B.R. 564 (Bankr.N.D.Cal.2007); *In re Bray*, 365 B.R. 850 (Bankr.W.D.Tenn.2007); *In re Price*, 363 B.R. 734 (Bankr.E.D.N.C. 2007);

15. *See Citifinancial Auto v. Hernandez–Simpson (In re Hernandez–Simpson)*, 369 B.R. 36 (D.Kan.2007) (Robinson, J.) (Creditor that provided loan to refinance negative equity remaining on trade-in and to acquire new vehicle only had PMSI in amount used to purchase new vehicle); *In re Kellerman*, 377 B.R. 302 (Bankr.D.Kan.2007) (Berger, J.); *In re Vega*, 344 B.R. 616 (Bankr.D.Kan.2006) (Karlin, J.).

16. *Billings v. Avco Colorado Ind. Bank (In re Billings)*, 838 F.2d 405, 406 (10th Cir.1988) (Courts uniformly look to the law of the state where the security interest was created to

to Kansas law, specifically Revised Article 9 of the Uniform Commercial Code as adopted in Kansas, KAN. STAT. ANN. § 84–9–103 (2007 Supp.) where a PMSI is defined as a security interest securing the repayment of a "purchase money obligation." A purchase money obligation is, in turn, defined as—

> (2) . . . an obligation of an obligor incurred as *all or part of the price of the collateral* or for *value given to enable the debtor to acquire rights* in or the use of the collateral if the value is in fact so used.[17]

Purchase-money collateral is defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral."[18] KAN. STAT. ANN. § 84–9–103(b) provides that—

> A security interest in goods is a purchase-money security interest:
>
> (1) To the extent that the goods are purchase-money collateral with respect to that security interest. . . . [19]

In other words, to the extent that the collateral has been obtained with funds loaned for that purpose by the creditor, the transaction is a PMSI.

The question then is whether that part of the loan paid to Central Star to cover the negative equity in the debtors' trade-in vehicle was an obligation incurred as "part or all of the price" or "value given to enable" debtors to acquire the pickup truck. This Court cannot see how it can be deemed anything other than but "all or part of the price" of the pickup or a part of the value given to enable its purchase. A part of the consideration for the sale of the pickup truck to the debtors was the trade-in of their old vehicle. That trade-in was valueless because of the negative equity. In order for Rusty Eck to realize on the trade-in, either the debtors or Rusty Eck had to pay off the outstanding lien against it. As the Official UCC Comment states—

> [T]he 'price' of collateral or the 'value given to enable' *includes* obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.[20]

Costs incurred in the release of the lien on the debtors' trade-in are "expenses incurred in connection with acquiring rights in the collateral . . ." and are, as such, within the expenses enumerated, without limitation, by the drafters in the Official Comment. Likewise, this Court notes the further statement of the drafters that there must be a "close nexus" between the acquisition of the collateral and the secured obligation.[21] That nexus is apparent here. The vehicle the debtors traded in was part of the consideration for the vehicle they bought. Unless and until Rusty Eck paid the debt on it, the vehicle was negative consideration. The Court therefore concludes that the financed negative equity falls within the definition of a purchase money obligation under § 84–9–103(a)(2).

In reaching this conclusion, the Court adopts the view and reasoning expressed

determine if it is a PMSI); *In re Horn,* 338 B.R. 110, 113 (Bankr.M.D.Ala.2006); *In re Gibson,* 16 B.R. 257 (Bankr.D.Kan.1981).

**17.** KAN. STAT. ANN. § 84–9–103(a)(2) (2007 Supp.) (Emphasis added).

**18.** KAN. STAT. ANN. § 84–9–103(a)(1) (2007 Supp.).

**19.** KAN. STAT. ANN. § 84–9–103(b)(1) (2007 Supp.).

**20.** KAN. STAT. ANN. § 84–9–103, Official Comment 3 (Emphasis added).

**21.** *Id.*

by a bankruptcy court sitting in Utah in *In re Burt.*[22] In *Burt,* the court looked to the Utah UCC to determine whether or not the negative equity portion of the debtor's car debt was part of the purchase money obligation—

> [T]he transaction with the Debtor was a package deal that included the purchase and financing of taxes, documentary fees, and negative equity, all of which were necessary to complete the transaction. Furthermore, the courts that have addressed the issue of whether the financing of a service contract and other fees prevents application of the hanging paragraph have held that the inclusion of these additional costs in the financing transaction did not prevent the creditor from taking a PMSI in the new vehicle.[23]

As a result, the *Burt* court held that the negative equity was part of the price of the new vehicle and that funds expended to repay the negative equity constituted value given to enable the debtor to acquire rights in the new vehicle.[24] As such the negative equity satisfied the definition of a PMSI and the entire debt was a purchase money obligation.

The Court finds further support for its conclusion that negative equity is part of the price or value given to enable acquisition of the collateral in Barkley Clark's Article 9 treatise.[25] Professor Clark devotes a subsection in his treatise to this issue and concludes that repayment of negative equity "fit[s] snugly into *both* prongs [price and value to enable]" of the definition of a purchase-money obligation.[26] The Court agrees.

Having concluded that the negative equity is a component of the purchase money obligation and therefore is secured by FMCC's PMSI, this Court need not consider the impact of the "dual-status" rule in this case. Indeed, the debtors concede in their plan that FMCC's lien is a PMSI, except to the extent it covers the negative equity component and, were the negative equity not a part of the purchase money obligation, that concession would be entirely consistent with state law. KAN. STAT. ANN. § 84–9–103(b)(1) provides that "to the extent" goods are purchase money collateral, the security interest in them is purchase money. KAN. STAT. ANN. § 84–9–103(f), as enacted in Kansas, provides that a purchase money lien does not lose that status even if it secures an obligation that is not purchase money. Because this Court concludes that the entire obligation is a purchase money obligation, no resort to the dual status rule is required.[27]

---

**22.** 378 B.R. 352 (Bankr.D.Utah 2007) (Thurman, J.)

**23.** *Id.* at 364–65.

**24.** *See also In re Austin,* 381 B.R. 892 (Bankr. D.Utah 2008) (Clark, J.).

**25.** Barkley Clark, 2 THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE, ¶ 12.05[10][b][vii], pp. 12–103–104.5 (Rev. ed.2007). Clark discloses his involvement in litigation on the negative equity issue on the side of the car loan lender. *Id.* at p. 12–104.5, n. 276.10.

**26.** *Id.* at p. 12–104.1. Clark makes clear, however, only one prong of the purchase-money obligation definition needs to be satisfied.

**27.** *See* Keith G. Meyer, A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code, 50 U. KAN. L.REV. 143, 155–59 (Nov.2001) for discussion of the transformation and dual status rules under revised Article 9. As noted in Meyer's Primer, Kansas did not adopt the uniform version of revised section 9–103(h) [limiting § 9–103(e), (f), and (g) to commercial transactions] in its revision to Article 9 and did not adopt all of the uniform version of revised section 9–103(f). Specifically, while the uniform version specifically states that the dual status rule in 9–103(f) applies in a non-consumer goods transaction, the Kansas version of § 9–103(f) makes no distinction between consumer goods transactions and non-consumer goods transactions. *See* Offi-

■ Finally, the Court also agrees with the *Burt* court that the federal Truth in Lending Act (TILA) does not aid or control its decision and therefore, the Court does not address the TILA's definition of "total sales price" in the context of this case.[28] The TILA does not determine whether a PMSI is created by the credit transaction. The TILA is a federal disclosure law, requiring creditors to make certain disclosures to consumer-borrowers concerning the cost of credit.[29] A PMSI, on the other hand, is determined in accordance with *state law*.[30] Here, that state law is Revised Article 9, as adopted in Kansas, which defines a PMSI.

This Court concludes that the debtors' negative equity in a trade-in vehicle, financed by the lender, is a part of the price of the collateral and constitutes value given to enable the debtors to acquire the collateral. As such, the financing of negative equity qualifies as a purchase money obligation secured by a PMSI and is subject to the hanging paragraph of § 1325(a)(*). Accordingly, debtors' plan cannot be confirmed as proposed and FMCC's objection to confirmation under the hanging paragraph is SUSTAINED. Debtors shall have 30 days from the entry of this order to file an amended plan to propose treatment of FMCC's claim in accordance with this opinion.

---

cial UCC Comment 7and 8, and § 84–9–103 (2007 Supp.).

**28.** 378 B.R. at 356, n. 15.

**29.** *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 53–54, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004) (TILA was enacted to assure meaningful disclosure of credit terms by lenders and enable consumers to make informed use of credit, 15 U.S.C. § 1601(a)); *Ramirez v. Household Finance Corporation (In re Ramirez)*, 329 B.R. 727, 731 (D.Kan.2005).

**30.** *In re Billings, supra* at n. 16, noting that the Bankruptcy Code does not define a PMSI

and that courts look to the law of the state where the security interest is created for the definition of a PMSI. This Court's review of Kansas law found no Kansas appellate decision that has decided the question of whether the financing of negative equity on a trade-in for a car loan transaction is a purchase money security interest. Thus, this Court must predict how the Kansas Supreme Court would interpret § 84–9–103 of Revised Article 9, as adopted in Kansas, in such a case. *See Redmond v. Kester (In re Kester)*, 339 B.R. 749, 753 (10th Cir. BAP 2006).