**In re Darin L. BURT, Debtor.**

No. 07–23193.

United States Bankruptcy Court, D. Utah.

Oct. 24, 2007.

Lee J. Davis, Law Office of Davis & Jones, PC, Salt Lake City, UT, for Debtor.

## MEMORANDUM DECISION

WILLIAM T. THURMAN, Bankruptcy Judge.

The matter before the Court is Ford Motor Credit Company, LLC's ("Ford Motor Credit") objection to confirmation of the Debtor's proposed chapter 13 plan. Ford Motor Credit objects to confirmation on the basis that the Debtor's proposed plan seeks to improperly cram down Ford Motor Credit's secured claim in violation of 11 U.S.C. § 1325(a)(*), otherwise referred to as the "hanging paragraph." The Debtor filed a response to Ford Motor Credit's objection and a separate objection to Ford Motor Credit's proof of claim, arguing that § 1325(a)(*) does not apply to Ford Motor Credit's claim because it does not hold a purchase money security interest ("PMSI") in the 2006 Ford F-150 truck (the "Truck" or "vehicle"). Specifically, the Debtor argues that the financing of the service contract and the negative equity eliminated Ford Motor Credit's PMSI, and therefore, Ford Motor Credit's claim is subject to a cram down[1] under 11 U.S.C. § 506.[2] The Court determines that Ford Motor Credit's entire claim,[3] including that portion of the claim attributable to negative equity and costs associated with the purchase of the vehicle, qualifies as a PMSI. Accordingly, the hanging paragraph of § 1325(a) applies, and the Debtor cannot "cram down" Ford Motor Credit's claim pursuant to § 506. Therefore, the Debtor's objection to Ford Motor Credit's claim is overruled and the proposed plan is denied confirmation for failure to comply with § 1325(a).

## I. BACKGROUND

Debtor, Darin L. Burt, filed a petition under Chapter 13 on July 13, 2007. On December 31, 2005, the Debtor purchased a 2006 Ford F-150 pickup truck for his personal use from LaPoint Automotive LLC ("LaPoint"). LaPoint financed the transaction through a Utah Simple Interest Retail Installment Contract (the "Contract"). Under the Contract, LaPoint retained a PMSI in the Truck. LaPoint later assigned its interest in the Truck to Ford Motor Credit, which perfected its security interest by notation on the Truck's title as required by the Utah Motor Vehicle Act.[4]

The Contract indicates that the cash price of the Truck was $32,630 and the total amount financed was $45,628.14. The difference between the two amounts included charges of $2,425 for a service contract, $500 for gap insurance, $298 for the document preparation fee, $1,149.46 for tax and license fees, and $11,021.68 to pay off the obligation owed on a trade-in vehicle (2004 Ford F-150). The negative equi-

---

1. A "cram down" is the process by which the debtor is able to retain the collateral over the creditor's objection to the proposed chapter 13 plan. The debtor does this by bifurcating the creditor's secured claim under § 506 and paying the secured portion at the value of the collateral, rather than the actual amount owed, with the difference then being treated as an unsecured claim. *See Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

2. All future statutory references are to title 11 of the United States Code unless otherwise indicated.

3. At the hearing on Ford Motor Credit's objection to confirmation, Ford Motor Credit indicated that it was withdrawing its claim to gap insurance and the service contract as part of the purchase price. Ford Motor Credit indicated that it will amend its proof of claim to reflect this modification. Therefore, any reference to Ford Motor Credit's "entire claim" should be understood to exclude the amounts attributable to the gap insurance and service contract.

4. UTAH CODE. ANN. § 41-1a-101 (2006) et seq.

ty rolled into the transaction therefore is the $11,021.68 payoff less the Debtor's down payment of $1,800 and the manufacturer's rebate of $3,000, yielding a net negative equity[5] of $6,221. The evidence before the Court shows that because of the Debtor's marginal credit, the Debtor was required to trade in his 2004 Ford F–150 in order to qualify for financing on the new vehicle. Furthermore, the evidence demonstrates that the Dealer would not have financed the purchase had the Debtor not agreed to all the terms of the Contract, including the refinancing of negative equity.

On August 30, 2007, Ford Motor Credit filed a proof of secured claim for its security interest in the Truck in the amount of $42,941.64.[6] Debtor filed his chapter 13 plan (the "Plan") on July 25, 2007, which proposes to bifurcate Ford Motor Credit's claim into a secured portion in the amount of $28,000 and an unsecured portion in the amount of the negative equity paid off by the financing transaction. Ford Motor

Credit objected to confirmation of the Debtor's plan on August 14, 2007, arguing that its entire claim qualified for treatment under the hanging paragraph of § 1325(a) and could not be bifurcated under § 506(a).

## II. JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. § 157(b)(2)(L). Venue is appropriate under 28 U.S.C. § 1408(1).

## III. ANALYSIS

■ In order to obtain confirmation of a Chapter 13 plan, the debtor must comply with the provisions of 11 U.S.C. § 1325(a). Sections 506(a)(1) and 1325(a)(5) provide for the required treatment of secured creditors. Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), sections 506(a)(1) and 1325(a)(5)(B) allowed a Chapter 13 debtor to bifurcate an under secured creditor's claim into se-

---

**5.** Negative equity results when a debtor trades in a vehicle that is "under water," meaning the trade-in vehicle has more debt against it than its value.

**6.** The Debtor has objected to Ford Motor Credit's proof of claim, arguing that the amount listed in the proof of claim is difference than what the Debtor owes under the Contract. Debtor asserts that Ford Motor Credit should be required to account for the extra $3,778.32 included in the Amount Financed portion of the Contract as this extra amount is not disclosed in the Itemization of Amount Financed portion of the Contract. Debtor claims that the cash price of $35,029 in the Contract should be adjusted by deducting the manufacturer's rebate of $3,000 and the Debtor's down payment of $1,800, and adding the negative equity amount of $1,021, to produce an Unpaid Cash Balance of $31,250.68. Debtor alleges that the total amount financed should only be $41,849.82 not $45.628.14 as noted on the Contract. Ford Motor Credit responded to Debtor's ob-

jection, asserting that the amounts listed in the Contract are accurate. Specifically, Ford Motor Credit claims that the Buyer's Order shows a trade-in allowance of $20,000 which was used to offset the balance owing on the trade-in vehicle of $31,021.68, leaving an initial negative equity of $11,021.68. Ford Motor Credit asserts that the Debtor's down payment of $1,800 and the manufacturer's rebate of $3,000 were properly applied to the initial negative equity, yielding a negative equity balance of $6,221.68. This amount was clearly identified as "negative equity" under the Itemization of Amount Financed in the Contract. Ford Motor Credit also claims that the Debtor is misreading the gross negative equity balance as $1,021.48 when it was $11,021.68. Because of the negative value of the trade-in vehicle, Ford Motor Credit notes that the cash price and the unpaid balance of cash price are the same at $35,029. The Court has reviewed the Contract and finds that the amounts listed in the creditor's proof of claim are properly accounted for and accurately reflect the amounts owed under the Contract.

cured and unsecured portions with the result that a creditor's claim was allowed as secured only to the extent of the value of the collateral securing its debt.[7] The portion of the creditor's claim allowed as secured would be paid in full with interest, whereas the unsecured portion of the claim would be paid pro rata with all other general unsecured claims.[8] This process of bifurcation is often referred to as "cram down."[9] BAPCPA, however, amended § 1325 to give special protection to creditors who finance automobile transactions that occur within 910 days prior to the debtors' filing for Chapter 13 relief.[10]

Under BAPCPA, Congress added the "hanging paragraph"[11] after § 1325(a)(9), which prevents the bifurcation of certain secured claims. Specifically, the hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49)

acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1–year period preceding that filing.[12]

■ Thus, in order to avoid a cram down, four conditions must be satisfied: (1) the creditor has a PMSI; (2) the debt was incurred within 910 days preceding the filing of the petition; (3) the collateral for the debt is a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor.[13] If these requirements are satisfied, "then the creditor's claim is deemed fully secured" and cannot be bifurcated.[14] The parties do not dispute that the collateral in this case was a motor vehicle purchased within 910 days of the debtor's petition or that it was acquired for the debtor's personal use. The only requirement that is in dispute is whether Ford Motor Credit's debt is secured by a PMSI. To determine this issue, the Court must first decide whether the negative equity from the trade-in vehicle that was rolled into the financing for the Truck as well as the other costs associated with the purchase constitute a PMSI as defined under Utah law.[15]

---

7. *In re Murray*, 346 B.R. 237, 241 (Bankr. M.D.Ga.2006).

8. 11 U.S.C. § 506(a)(1).

9. *In re Pajot*, 371 B.R. 139, 146 (Bankr. E.D.Va.2007); *Murray*, 346 B.R. at 241.

10. *Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 256 (W.D.N.Y.2007) (hereinafter *"Peaslee II"*).

11. It is commonly referred to as the "hanging paragraph" because it follows the numbered subsections of § 1325(a) but has no numerical designation of its own.

12. 11 U.S.C. § 1325(a)(*).

13. *Peaslee II*, 373 B.R. at 257; *In re Acaya*, 369 B.R. 564, 567 (Bankr.N.D.Cal.2007).

14. *Peaslee II*, 373 B.R. at 257 (citing *In re Belcher*, 369 B.R. 465, 468 (Bankr.E.D.Ark. 2007)).

15. Both parties suggest in their briefs that since the term "PMSI" is not defined in the Bankruptcy Code, the Court should look to Utah law, specifically Article 9 of the UCC, to determine the definition of the term. However, Ford Motor Credit argues, that in addition to the UCC, the Court should also consider the Federal Truth in Lending Act's ("TILA") definition of "total sales price" as support for including negative equity in the PMSI. The Debtor disagrees, noting that "total sales price" as defined by TILA has no bearing on the definition of PMSI because it is only a disclosure statute that requires creditors extending financing to consumers to disclose the costs of the credit. The Court is persuad-

## A. Whether Ford Motor Credit Holds a PMSI Securing Its Debt, Including the Negative Equity on the Trade-in Vehicle and the Other Transaction Costs

In order to address the effect of the hanging paragraph, the Court must first determine the extent to which Ford Motor Credit's security interest is a PMSI.[16] The term "purchase money security interest" as used in the hanging paragraph, is not defined in the Bankruptcy Code.[17] Therefore, courts uniformly refer to state law, and specifically to the state's version of the Uniform Commercial Code ("UCC"), to determine whether a creditor holds a PMSI.[18] The applicable statute in Utah is Utah Code Annotated § 70A–9a–103(2), which provides that "[a] security interest in goods is a purchase-money security interest . . . to the extent that the goods are a purchase-money collateral with respect to that security interest. . . ." "Purchase-money collateral" is defined as "goods . . . that secure[ ] a purchase-money obligation incurred with respect to that collateral,"[19] and "purchase-money obligation" is defined as "an obligation of an obligor incurred as all or part of the *price of the collateral* or for *value given to enable* the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[20]

Whether a PMSI exists in this case, then, "turns on whether the negative equity on the debtor's trade-in vehicle constitutes 'part of the price of the collateral,' *i.e.* part of the price of the new vehicle, or whether it constitutes 'value given to enable the debtor to acquire rights in or the use of the collateral. . . .' "[21] Although § 70A–9a–103 does not define the terms "price" or "value given," Comment 3 to § 70A–9a–103 states that "the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales, taxes, duties, finance charges, interest freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations."[22]

Both parties in this case agree that the definition of "purchase money security interest" as set forth in § 70A–9a–103 should control. They disagree, however, on whether the negative equity from the debtor's trade-in vehicle that was rolled into the financing transaction for the Truck constitutes a PMSI. The Debtor argues that the negative equity on the Debtor's trade-in is neither part of the

ed by the Debtor's argument and finds that UCC, and not TILA, is the relevant statute for determining whether Ford Motor Credit's interest qualifies as a PMSI.

16. *In re Pajot*, 371 B.R. 139, 147 (Bankr. E.D.Va.2007).

17. *See id.; Peaslee II*, 373 B.R. at 257; *In re Cohrs*, 373 B.R. 107, 109 (Bankr.E.D.Cal. 2007); *In re Graupner*, 356 B.R. 907, 911 (Bankr.M.D.Ga.2006), *aff'd, Graupner v. Nuvell Credit Corp.*, 2007 WL 1858291 (M.D.Ga. June 26, 2007); *In re Price*, 363 B.R. 734, 740 (Bankr.E.D.N.C.2007); *In re Pajot*, 371 B.R. 139, 147 (Bkrtcy.E.D.Va.2007).

18. *See, e.g., Graupner*, 356 B.R. at 911 ("whether a creditor holds a PMSI is a matter of state law"); *accord Peaslee II*, 373 B.R. at 257; *Pajot*, 371 B.R. at 147; *Price*, 363 B.R. at 740; *In re Acaya*, 369 B.R. 564, 567 (Bankr.N.D.Cal.2007); *Citifinancial Auto v. Hernandez–Simpson*, 369 B.R. 36, 45 (D.Kan. 2007).

19. Utah Code Ann § 70A–9a–103(1)(a).

20. Utah Code Ann. § 70A–9a–103(1)(b) (emphasis added).

21. *Peaslee II*, 373 B.R. at 258.

22. Utah Code Ann. § 70A–9a–103 cmt. 3.

"price" of the new vehicle nor "value given to enable" the Debtor to acquire rights in the vehicle. The Debtor further argues that refinancing of "antecedent debt" is not included in the list of expenses enumerated in Comment 3, nor is it an obligation similar to those provided in that list. The Debtor also contends that Ford's acceptance of the trade-in vehicle on the condition that the negative equity be paid off, and Ford's willingness to extend the funds to do so, does not make it an "expense incurred" to acquire rights in the new vehicle. Ford Motor Credit, on the other hand, argues that the negative equity from the Debtor's trade-in vehicle clearly falls within both categories of the definition of a PMSI.

A number of courts throughout the country have recently interpreted the effect of the hanging paragraph exception on motor vehicle financing transactions that include negative equity.[23] However, no clear consensus amongst the courts has yet emerged on this issue.[24] The Court believes that a summary of the most relevant decisions would be helpful.

One line of cases, which includes the bankruptcy court decisions in *Peaslee I, Price, Acaya, Barnes,* and *Pajot,* holds that negative equity is not part of the purchase price of the collateral, and there-fore, does not give rise to a PMSI.[25] In *Peaslee I,*[26] a secured creditor objected to confirmation of the debtor's Chapter 13 plan that provided for bifurcation of the creditor's claim secured by the debtor's 2004 Pontiac Grand Am.[27] The car was purchased within 910 days preceding bankruptcy, and the creditor allegedly had a PMSI in the vehicle which was acquired for personal use. The debtor's plan proposed to cram down the creditor's claim to $10,950, which was the value of the vehicle, and to give the creditor an unsecured claim for the balance. The creditor objected to this treatment, arguing that the entire amount of its claim consists of a debt that is secured by a PMSI. The Chapter 13 Trustee, however, filed a valuation motion asserting that only a portion of the creditor's claim should be allowed as a secured claim because the amount financed included $5,980 of rolled-in negative equity from the debtor's trade-in vehicle.

The bankruptcy court rejected the creditor's objection and held that the creditor did not have a purchase money security in that portion of the amount financed that was used to pay off the negative equity on the debtor's trade-in vehicle.[28] In reaching this conclusion, the Court looked to the New York version of the UCC, which defines a PMSI as "an obligation of an obli-

---

**23.** *See, e.g., In re Peaslee,* 358 B.R. 545 (Bankr.W.D.N.Y.2006), *rev'd, Gen. Motors Acceptance Corp. v. Peaslee,* 373 B.R. 252 (W.D.N.Y.2007) (hereinafter *"Peaslee I"); In re Pajot,* 371 B.R. 139 (Bankr.E.D.Va.2007); *In re Barnes,* Case No. 13–06–11169 (Bankr. D.N.M. Apr. 6, 2007); *In re Price,* 363 B.R. 734 (Bankr.E.D.N.C.2007); *In re Acaya,* 369 B.R. 564 (Bankr.N.D.Cal.2007); *Citifinancial Auto v. Hernandez–Simpson,* 369 B.R. 36 (D.Kan.2007); *Graupner v. Nuvell Credit Corp.,* No. 4:07–CV–37, 2007 WL 1858291 (M.D.Ga. June 26, 2007); *In re Petrocci,* 370 B.R. 489 (Bankr.N.D.N.Y.2007); *In re Cohrs,* 373 B.R. 107 (Bankr.E.D.Cal.2007).

**24.** *Peaslee II,* 373 B.R. at 255.

**25.** *Peaslee I,* 358 B.R. at 558; *In re Acaya,* 369 B.R. at 570; *Citifinancial Auto,* 369 B.R. at 45; *In re Barnes,* Case No. 13–06–11169 at 4–5; *In re Pajot,* 371 B.R. at 147.

**26.** The District Court for the Western District of New York recently reversed the bankruptcy court and overruled *Peaslee I* in an appeal which consolidated several individual cases with common negative equity issues.

**27.** *Peaslee I,* 358 B.R. at 548.

**28.** *Id.* at 554.

gor incurred as ... part of the *price* of the collateral or for *value given* to enable the debtor to acquire rights in ... the collateral."[29] The Court concluded that neither the "price" nor the "value given to enable" prongs of UCC § 9–103 covered negative equity.[30] The Court further explained that "the term 'enable' refers to what it has always referred to, which is the value given to allow the debtor to pay ... the actual price of ... the replacement vehicle," not additional sums.[31] The Court, therefore, ruled that refinancing of negative equity as part of the replacement vehicle's purchase did not result in a PMSI under New York law. The Court viewed the financing of the new car and the refinancing of negative equity on the debtor's trade-in as "simply two separate financial transactions memorialized on a single retail installment contract...."[32] "However, the debt incurred in the separate optional transaction where negative equity is refinanced as a part of the combined transaction does not result in a purchase money obligation and the resulting security interest taken for that debt is not a PMSI."[33] The Court then adopted the "transformation rule"[34] and concluded that, based on that rule, the creditor did not have a PMSI in the debtor's vehicle in any amount, and therefore, the creditor's entire claim was subject to a cram down.[35]

Similarly, in *Price* the debtors' Chapter 13 plan proposed to bifurcate a secured creditor's claim into a secured claim to the extent of the value of the vehicle, which the debtors valued at $12,475, and an unsecured claim for the balance. The creditor, Wells Fargo, objected to confirmation of the debtors' plan, asserting that it held a PMSI in the debtors' 2001 Lincoln LS which was acquired within 910 days preceding bankruptcy and that the hanging paragraph precluded the bifurcation of its secured claim.[36] The debtors disagreed, arguing that the creditor did not have a PMSI because the amount of its claim included obligations separate from, and in addition to, the purchase price of the vehicle. The bankruptcy court denied Wells Fargo's objection to confirmation of the plan and held that the money advanced to pay the cost of the gap insurance was not part of the purchase price of the vehicle, and therefore, did not constitute a PMSI.[37] The Court further held that the funds advanced to pay off the negative equity on the debtors' trade-in vehicle were not part of the purchase price and did not give rise to PMSI.[38] Consequently, the Court held that Wells Fargo did not have a PMSI for the full amount of its claim.[39] The Court relied on North Carolina's version of the UCC, stating that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a PMSI if a debtor acquires property on unsecured credit and subsequently creates

29. *Id.* at 556 (quoting U.C.C. § 9–103).

30. *Id.* at 557–58.

31. *Id.* at 557.

32. *Id.* at 558.

33. *Id.*

34. The "transformation rule" provides that when a transaction contains both purchase money and non-purchase money obligations,

the entire transaction is transformed into a non-purchase money obligation.

35. *Peaslee I*, 358 B.R. at 560.

36. *Price*, 363 B.R. at 737–38.

37. *Id.* at 741.

38. *Id.*

39. *Id.* at 742.

the security interest to secure the purchase price."[40] The Court further stated that "[i]f Congress intended the hanging paragraph to provide for the disparate treatment of a claim that is only partially secured by a PMSI, it could easily have done so as it had in other sections of the Code."[41] The Court then considered whether to apply the dual status rule or the transformation rule and held that "when negative equity is involved, the appropriate rule is the transformation rule."[42] The Court concluded that pursuant to the transformation rule, Wells Fargo's claim was not secured by a PMSI in any amount, and therefore, could be crammed down to the value of the collateral.[43]

In contrast, the district court decisions in *Peaslee II* and *Graupner,* and the bankruptcy court's decisions in *Petrocci* and *Cohrs,* hold that the definition of PMSI includes negative equity rolled into a new motor vehicle financing transaction.[44] In *Peaslee II,* the district court, on appeal, considered "the extent to which a creditor [held] a PMSI in connection with a motor vehicle sale in which the seller allow[ed] the buyer to 'roll in' the 'negative equity' on a trade-in vehicle...."[45] In reversing the bankruptcy court decision, the district court held that the creditor's entire claim, including the portion attributable to the negative equity on the debtor's trade-in vehicle, should be treated as a secured claim.[46] The Court focused on the definition of PMSI in UCC § 9–103 and Comment 3, and found that both the "price" of the collateral and the "value given" prongs covered negative equity. The Court further noted that the payoff of the negative equity was precisely the type of "expense incurred in connection with acquiring rights in the collateral" contemplated by Comment 3. The Court explained that the items included in Comment 3 (sales taxes, duties, etc.) are not listed as examples of "expenses" incurred in connection with purchasing a vehicle but as *"additional* components of the 'price' of the collateral or of 'value given' by the debtor."[47] Therefore, "it would be difficult" to see how refinancing of rolled-in negative equity "could *not* be viewed as ... an expense" incurred in connection with acquiring rights in the new vehicle.[48] The Court then considered the second part of Comment 3, which states that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation."[49] The Court held that "[w]here the parties to the transaction agree to a 'package transaction' in which the negative equity is inextricably intertwined with the sales transaction and the financing of the purchase, one could certainly conclude that this close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of

---

40. *Id.* at 740–41 (citing to N.C. GEN. STAT. § 25–9–103 (2005) & cmt. 3).

41. *Id.* at 743.

42. *Price,* 363 B.R. at 746.

43. *Id.*

44. *Peaslee II,* 373 B.R. at 259–60; *Graupner,* 356 B.R. at 923; *Petrocci,* 370 B.R. at 501; *Cohrs,* 373 B.R. at 110–11.

45. *Peaslee II,* 373 B.R. at 255.

46. *Id.* at 262.

47. *Id.* at 258.

48. *Id.*

49. *Id.* at 259.

the collateral."[50] The Court then considered the New York Motor Vehicle Retail Installment Sales Act's definition of "cash sales price," which includes negative equity, as additional support for concluding that negative equity was entitled to a status as a PMSI.[51]

In *Graupner*, the secured creditor objected to confirmation of the debtor's Chapter 13 plan where the secured claim in a 2005 Chevrolet Silverado would be bifurcated into secured and unsecured portions and crammed down. At issue was whether the creditor retained a PMSI within the meaning of § 1325(a)(*) when the total amount financed as part of the debtor's purchase of the new vehicle included negative equity from a trade-in vehicle.[52] Relying on § 11–9–103 of the Georgia Code, the Court concluded that "the price of the collateral" as defined in Comment 3 included negative equity.[53] The Court noted that the trade-in of the vehicle was "an integral part of the sales transaction," and that "the value of that trade-in along with its accompanying debt affected the ultimate price that was paid for the new [vehicle]."[54] Because of the "close nexus" between the negative equity and the financing of the new vehicle, the Court concluded that negative equity had to be considered as part of the price of the collateral.[55] The Court, therefore, affirmed the bankruptcy court's decision that

the creditor had a PMSI for the full amount of its debt and its claim could not be bifurcated under § 506.[56]

In *Cohrs*, as in the present case, the debtor's plan proposed to cram down the creditor's secured claim in the debtor's truck, which was purchased within 910 days of the debtor's bankruptcy filing.[57] The creditor objected to confirmation of the debtor's plan, arguing that the hanging paragraph prevented the debtor from cramming down its secured claim to the value of the truck. The debtor argued that the hanging paragraph did not apply to prevent bifurcation of the creditor's claim because the inclusion of the negative equity with the purchase price of the truck destroyed the purchase money security character of the creditor's interest. The Court rejected the debtor's argument and held that the creditor retained a PMSI in the entire transaction even though part of the amount financed was used to pay off the negative equity on the debtor's trade-in vehicle. Relying on California's version of UCC § 9–103, the Court explained that the term "value given to enable the debtor to acquire rights in the collateral" used in the definition of PMSI is broad enough to include negative equity.[58] Specifically, the Court noted that "[w]hen a car buyer offers to trade in a vehicle as part of the purchase price for another vehicle, the charges incidental to transferring the

50. *Id.* (quoting *Graupner*, 2007 WL 1858291, at *2) (internal quotations omitted).

51. *Id.* at 259–60.

52. *Graupner*, 2007 WL 1858291, at *1.

53. *Id.* at *2.

54. *Id.; see also Petrocci*, 370 B.R. at 499 (holding that "[t]his negative equity financing is inextricably linked to the financing of the new car" because "[i]t is clear that one would not take place without the other."); *Murray*, 346 B.R. at 240 (concluding that the financing of an extended service contract and the

documentary fee "did not prevent a creditor from taking a purchase-money security interest in the ... vehicle" since "there is no requirement in § 1325(a)(*) that a creditor be secured *only* by a motor vehicle.").

55. *Graupner*, 2007 WL 1858291, at *2.

56. *Id.*

57. *Cohrs*, 373 B.R. at 108.

58. *Id.* at 109.

trade-in vehicle are part of the purchase price of the new vehicle" and are "incurred to 'enable the debtor to acquire rights' in the new vehicle." [59] Therefore, when a creditor "finances the purchase of a new vehicle and, as part of the transaction also pays off [the negative equity] on the trade-in vehicle, the loan extended is a purchase money obligation of the buyer, the new vehicle is purchase money collateral, and the lender's security interest is a PMSI." [60] As a result, the lender's claim is protected by the hanging paragraph and cannot be crammed down to the value of the vehicle.

This Court is persuaded by the decisions in *Peaslee II, Graupner, Petrocci*, and *Cohrs* that the negative equity and the other costs related to the purchase of the collateral should be included in the PMSI of a secured creditor. The Court believes that this interpretation is consistent with the plain language of the Bankruptcy Code as amended by the BAPCPA and with the applicable provisions of the UCC as adopted in Utah. Specifically, the Court finds that § 1325(a)(*), otherwise referred to as the hanging paragraph, prohibits the cram down of a secured creditor's claim where negative equity on the debtor's trade-in vehicle is financed together with the cash price of the new vehicle and other transaction costs.

■ The Court further finds that because the term "purchase-money security interest" used in the hanging paragraph is not defined in the Bankruptcy Code, the Court must look to Utah's version of the Uniform Commercial Code. Utah's Uniform Commercial Code, Utah Code Ann. § 70A–9a–103, is identical to the New York, Georgia, and California statutes defining PMSI as cited in *Peaslee II, Graupner*, and *Cohrs* respectively. As did the courts in *Peaslee II, Graupner*, and *Cohrs*, this Court determines that the terms "price" and "value given to enable" as defined in § 70A–9a–103 should be interpreted broadly to include negative equity from the debtor's trade-in vehicle and other transaction costs connected to the purchase of the debtor's Truck. The Court is not persuaded that the term "price of the collateral" as used in UCC § 9–103 should be limited to the "actual price" or the sticker price of the new vehicle.

■ The Court's position is further reinforced by the language of Official Comment 3 to § 70A–9a–103, which states that the "price" of the collateral as it is used in the definition of PMSI includes much more than "the actual price of the collateral being acquired." [61] Specifically, Comment 3 states that the "price of the collateral" or "value given to enable" includes "obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges . . . and other similar obligations." Like the courts in *Peaslee II* and *Cohrs*, the Court believes that this list is not exhaustive and the expenses identified in Comment 3 are merely examples or additional components of the "price of the collateral" or of "value given" to the debtor.[62] Therefore, just as the courts in *Peaslee II, Cohrs*, and *Petrocci*, this Court cannot see how the refinancing of negative equity and the other transaction costs incurred in connection with the purchase of the debtor's new Truck could not qualify as an "expense" within the meaning of Comment 3.

---

**59.** *Id.* at 109–10.

**60.** *Id.* at 110.

**61.** *See Petrocci*, 370 B.R. at 498–99 (citing and distinguishing *Peaslee*, 358 B.R. at 556).

**62.** *Peaslee II*, 373 B.R. at 258; *Cohrs*, 373 B.R. at 109.

The Court believes that this reasoning is even more persuasive "[i]f the buyer and seller agree to include the payoff of the outstanding balance on a trade-in [and the other transaction costs] as an integral part of their transaction for the sale of the new vehicle...."[63] The debtor and the dealer in this case agreed that as part of the purchase of the Truck and pursuant to the Contract, the dealer would advance funds to pay off the lien on the debtor's trade-in vehicle and to cover tax, license, and document preparation fees. Essentially, this was a package deal. Ford Motor Credit later stepped into the purchase-money lender shoes of the dealer. The Court concludes that the agreement and the dealings between the debtor and the dealer/creditor demonstrate that the costs of satisfying these outstanding obligations of the debtor were clearly incurred in connection with the purchase of the new vehicle.

Additionally, the Court finds further support in part two of Comment 3 which states that " '[t]he concept of "PMSI" requires a close nexus between the acquisition of the collateral and the secured obligation.' "[64] The courts in *Peaslee II, Graupner, Cohrs*, and *Petrocci* have interpreted this requirement to mean that where the parties to the transaction agree to a package deal in which negative equity is "inextricably intertwined" with the sales transaction and the financing of the purchase, this close nexus between the negative equity and the package transaction supports the conclusion that negative equity is part of the price of the collateral.[65]

The Court finds that in the present case, there is a very close connection between the negative equity and the financing of the Debtor's new vehicle. As noted earlier, the financing transaction was a package deal where the negative equity in the trade-in was paid off by the dealer as part of its retail installment sale of the new vehicle and the related obligation was included in the retail installment contract with the Debtor. All of the amounts financed in the contract, except the gap insurance and service contract, were directly connected to the Debtor's purchase of the new vehicle. In fact, the evidence before this Court shows that Ford Motor Credit would not have financed the total purchase price had the Debtor not agreed to all the terms of the Contract including the negative equity and add-on transaction costs. The Court, therefore, concludes that because of this close nexus between the negative equity and the financing of the Debtor's new vehicle, the entire transaction also qualifies as a PMSI.

Accordingly, Ford Motor Credit's entire claim, including that portion of the claim attributable to the payoff of negative equity on the Debtor's trade-in vehicle and the other transaction costs, should be allowed as a fully secured claim that must be paid in full through the Debtor's chapter 13 plan.

**B. The Use of the Loan Proceeds to Refinance the Negative Equity on the Debtor's Trade-in Vehicle and to Pay off Transaction Costs Associated with the Purchase of the New Vehicle Does not Destroy Ford Motor Credit's Purchase Money Security Interest**

The Debtor argues that since the transaction granting a security interest included debt other than that incurred for the cash

---

63. *Peaslee II,* 373 B.R. at 259.

64. Utah Code Ann. § 70A–9A–103 cmt. 3.

65. *Peaslee II,* 373 B.R. at 259 (citing *Graupner,* 2007 WL 1858291, at *2, *Cohrs,* 373 B.R. 107, 2007 WL 2186135, at *2, and *Petrocci,* 370 B.R. 489, 2007 WL 1813217, at *9).

price of the new vehicle, the protection under the hanging paragraph does not apply to any element of financing. Therefore, the Debtor argues that Ford Motor Credit's entire claim is subject to cram down and bifurcation under § 506. In response, Ford Motor Credit argues that it holds a PMSI in the entire amount of the debt, including the negative equity and the other charges financed as part of the purchase of the Debtor's new vehicle.

■■ The arguments advanced in this case appear to be similar to those advanced by the parties in *In re Ericksen*,[66] decided by this Court on July 26, 2006. The debtors in that case, like the Debtor here, argued that because they used the loan proceeds to pay for other charges, such as taxes and an insurance policy, the creditor could not have a PMSI in the vehicle. In making these arguments, the debtors relied on the "transformation rule" followed in some jurisdictions that states that purchase money status is destroyed where the collateral secures more than its price.[67] In essence, when the loan proceeds are used to acquire both purchase money and non-purchase money collateral, the entire security interest is transformed into a non-PMSI. The creditor, like Ford Motor Credit, argued that the "dual status rule" applied. The dual status rule "allows a security interest to have both the status of a PMSI, to the extent that it is secured by collateral purchased with loan proceeds, and the status of a general security interest, to the extent that the collateral secures obligations unrelated to its pur-

chase."[68] Essentially, under this rule, purchase money status is not destroyed when collateral secures more than its price. Rather, a PMSI exists to the extent that loan proceeds were used to purchase the collateral.[69]

After a detailed analysis of both rules, this Court rejected the "transformation rule" and held that the "dual status rule applied." In applying the "dual status rule" to the facts of that case, the Court concluded that the amounts advanced to pay for sales and property taxes, the document preparation fee, and the credit report fees qualified as part of the "price of the collateral" and were part of the creditor's PMSI.[70] The creditor, however, did not have a PMSI to the extent that the loan proceeds were used to purchase the insurance policy.[71]

The Court determines that, contrary to the Debtor's assertion, the transactions in question are not mixed but are entirely purchase money obligations as defined in § 70A–9a–103. As noted earlier in this Decision, the transaction with the Debtor was a package deal that included the purchase and financing of taxes, documentary fees, and negative equity, all of which were necessary to complete the transaction. Furthermore, the courts that have addressed the issue of whether the financing of a service contract and other fees prevents application of the hanging paragraph have held that the inclusion of these additional costs in the financing transaction did

---

66. *In re Ericksen*, 06–20572, 2006 WL 4846379 (Bankr.D.Utah July 26, 2006) (Thurman, J.).

67. *See Billings v. Avco Colo. Indus. Bank (In re Billings)*, 838 F.2d 405, 407 (10th Cir.1988) (summarizing those courts that have followed the transformation rule).

68. *Petrocci*, 370 B.R. at 504 (citing *In re Ionosphere Clubs, Inc.*, 123 B.R. 166, 172 (S.D.N.Y.1991)).

69. *Ericksen*, 2006 WL 4846379 at *6.

70. *Id.* at *8.

71. *Id.*

not prevent the creditor from taking a PMSI in the new vehicle.[72]

 Even if the Court were to find some support for the Debtor's argument, the Court determines that under the dual status rule as adopted by this Court in *Ericksen*, Ford Motor Credit's entire claim consists of a debt that is secured by a PMSI and cannot be crammed down. Specifically, as in *Ericksen*, the Court here finds that the amounts advanced to pay for taxes, the document preparation fee, and the negative equity on the Debtor's trade-in vehicle fall within the definition of the "price" of the vehicle or "value given to enable" the Debtor to purchase the vehicle. As a result, because all of these expenses were necessary to complete the transaction, they are part of Ford Motor Credit's PMSI and are protected under the hanging paragraph.[73] Accordingly, even if the Court were to apply the dual status rule in this case, the purchase money portion of Ford Motor Credit's claim (which is the entire amount) is protected from cram down.

### C. Applicable Interest Rate

One issue raised by the parties during the confirmation hearing was the appropriate interest rate to be paid should the Court conclude that Ford Motor Credit's claim is an "allowed secured claim." Although this issue was not argued by the parties, nor was it addressed in their briefs, the Court believes that the applicable interest rate will be the current market interest rate as determined by the United States Supreme Court in *Till v. SCS Credit Corp.*[74] However, since the issue was not argued, nor facts presented to support it, the Court need not address it further.

## IV. CONCLUSION

For the above reasons, Ford Motor Credit's objection to confirmation is sustained, the Debtor's objection to Ford Motor Credit's claim is overruled, and the plan is denied confirmation without prejudice for failure to comply with § 1325(a). The Debtor may submit a new plan consistent with this opinion. An order will be issued contemporaneously herewith.

---

**72.** *Murray,* 346 B.R. at 240; *In re Johnson,* 337 B.R. 269 (Bankr.M.D.N.C.2006).

**73.** *Ericksen,* 2006 WL 4846379 at **7–8.

**74.** 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004).