In re David J. DUNLAP and Felicia Dunlap, Debtors.

No. 07–24392–jes.

United States Bankruptcy Court, E.D. Wisconsin.

Jan. 31, 2008.

114

Michael J. Watton, Milwaukee, WI, for Debtors.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

### *INTRODUCTION*

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") has spawned many legal issues. Among these issues is the dispute now before this court as to whether negative equity financing[1] is a purchase money security interest ("PMSI") or is a non-PMSI. The consequences of this determination are as follows: under the "hanging paragraph,"[2] a borrower cannot "cram down" the secured car lender's claim into a secured claim (to the extent of the value of the collateral) and an unsecured claim (for the balance of the loan). Before the hanging paragraph was enacted into law, a chapter 13 debtor could, under § 506(a) of the Bankruptcy Code, utilize cram down. The following elements must be estab-

1. "Negative equity financing" is a term used when a new car loan includes, as part of financing, payment of the entire loan balance on the trade-in car, including that amount of the loan balance which exceeds the trade in value allotted to the trade-in car.

2. The term "hanging paragraph" adopted in BAPCPA refers to an unnumbered paragraph added to the end of § 1325(a) of the Bankruptcy Code, frequently identified as § 1325(a)(*), which reads as follows:

    For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1–year period preceding that filing. . . .

lished in order for the hanging paragraph to apply:

1.  the secured car lender holds a PMSI,
2.  the collateral consists of a motor vehicle,
3.  the debt incurred for the purchase of the new car was incurred within 910 days of the filing of the chapter 13 petition, and
4.  the new car was acquired for the debtor's personal use.

11 U.S.C. § 1325(a)(*). The only element in dispute is the first element—whether Nissan Motor Acceptance Corporation ("Nissan"), by using negative equity financing, holds a PMSI.

This issue has been raised on the objection by David J. Dunlap and Felicia Dunlap ("debtors") to the proof of claim filed by the secured lender, Nissan, and on Nissan's objection to confirmation of the debtors' chapter 13 plan.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), (L), and (O).

## FACTUAL BACKGROUND

On February 9, 2006, the debtors entered into a simple interest retail installment contract with Russ Darrow Honda, a car dealer, for the purchase of a 2006 Nissan Armada automobile ("new car"). The cash price for the new car was $41,614, before applying credits for any trade-ins, rebates, or cash payments. The debtors' down payment toward the purchase of the new car consisted of a trade-in of their 2004 Chevrolet Impala automobile ("trade in car" or "old car"), valued by the dealer at a trade-in value of $10,409, a $7,000 cash payment by the debtors, and a $2,000 manufacturer's rebate—in all, a combined down payment of $19,409.

When the debtors entered into the purchase of the new car, they owed $22,919 on the trade-in car to Wells Fargo Acceptance Corporation ("Wells Fargo"), the secured car lender who provided financing for the debtors' trade-in car.

The total amount financed by the debtors with Nissan in connection with the new car was $47,539.98, with interest at 8.64%. This amount included the $22,919 balance due to Wells Fargo.

The debtors filed a voluntary petition under chapter 13 of the Bankruptcy Code on June 7, 2007. Nissan filed its proof of claim as fully secured in the amount of $44,217.70. The debtors' plan invoked cram down, providing Nissan with a secured claim for $27,887.50, which the debtors assert was the fair market value of the new car at the time they filed their chapter 13 bankruptcy petition. The debtors' plan also provides that the balance of the loan due to Nissan constitutes an unsecured claim for which Nissan is to receive a 1% dividend.

The parties have submitted a stipulation of facts and briefs on the issue of whether the financed transaction between these parties is a PMSI or a non-PMSI. The parties agree that the negative equity portion of the loan financed with Nissan is $12,510 (based on the $22,919 balance due to Wells Fargo less the $10,409 trade-in value for the old car as established by Russ Darrow Honda).

## DEBTORS' ARGUMENT

Debtors contend that, because of the negative equity financing, Nissan holds a non-PMSI and therefore the hanging paragraph does not apply. As a result, the debtors further contend that the entire loan balance owed to Nissan is subject to cram down under § 506 of the Bankruptcy Code. Debtors further submit that the court should apply the "transformation rule" and strip down the secured portion of

Nissan's claim to $27,887.50, the fair market value as asserted by the debtors in their chapter 13 plan. The debtors alternatively argue that, if the court declines to apply the "transformation rule," it should then apply the "dual status rule." Under the "dual status rule" Nissan's security interest consists of a purchase money component and a non-purchase money component and the debtors can utilize cram down with respect to the non-purchase money component. Using this approach, Nissan's secured claim is calculated as follows: $47,539.98 (amount financed) less $22,929 (amount of negative equity financed), leaving Nissan with a secured claim for $24,620.98.

## NISSAN'S ARGUMENT

Nissan argues that it has a PMSI in the new car for the entire balance of $44,217.70, as contained in its proof of claim. Nissan further submits that this purchase and sale was a single package transaction and that the trade in of debtors' old car, including payment of the balance due on the old car which resulted in negative equity, was an "integral part" of this transaction which enabled the debtors to purchase this vehicle. Nissan states that the negative equity component did not create a non-PMSI and, accordingly, the debtors are precluded from modifying Nissan's claim in any manner. Nissan alternatively argues that, should the court reject this argument, Nissan's claim, under the "dual status rule," is $28,717.70.[3]

## LAW

The case law on the subject of whether negative equity financing is a PMSI or a non-PMSI is split, and presently, there are no known reported federal court of appeals decisions.

Cases supporting the debtors' position include: In re Horn, 338 B.R. 110 (Bankr. M.D.Ala.2006); In re Price, 363 B.R. 734 (Bankr.E.D.N.C.2007); In re Peaslee, 358 B.R. 545 (Bankr.W.D.N.Y.2006) ("Peaslee I") rev'd, In re Peaslee, 373 B.R. 252 (W.D.N.Y.2007) ("Peaslee II"); In re Pajot 371 B.R. 139 (Bankr.E.D.Va.2007); In re Stevens, 368 B.R. 5 (Bankr.D.Neb.2007); In re Hernandez–Simpson, 369 B.R. 36 (D.Kan.2007); In re Bray, 365 B.R. 850 (Bankr.W.D.Tenn.2007); In re Mitchell, 379 B.R. 131 (Bankr.M.D.Tenn.2007); In re Sanders, 377 B.R. 836 (Bankr.W.D.Tex. 2007); In re Westfall, 365 B.R. 755 (Bankr. N.D.Ohio 2007); In re Blakeslee, 377 B.R. 724 (Bankr.M.D.Fla.2007); In re Conyers, 379 B.R. 576 (Bankr.M.D.N.C.2007).

Cases supporting Nissan's position include: In re Cohrs, 373 B.R. 107 (Bankr. E.D.Cal.2007); In re Graupner, 356 B.R. 907 (Bankr.M.D.Ga.2006), aff'd, 2007 WL 1858291 (M.D.Ga.2007); Peaslee II, 373 B.R. 252; In re Petrocci, 370 B.R. 489 (Bankr.N.D.N.Y.2007); In re Wall 376 B.R. 769 (Bankr.W.D.N.C.2007); In re Burt, 378 B.R. 352 (Bankr.D.Utah 2007); In re Bradlee, 2007 Bankr.LEXIS 3863 (Bankr.W.D.La.2007); In re Weiser, 381 B.R. 263 (Bankr.W.D.Mo.2007); In re Watson, 2007 WL 2873434 (Bankr.E.D.Cal. 2007).

Cases which have adopted the "dual status rule" approach (which is debtors' alternative position) include: In re Lavigne, 2007 WL 3469454 (Bankr.E.D.Va.); In re Conyers, 379 B.R. 576 (Bankr.M.D.N.C.);

---

**3.** Nissan's computation of $28,717.70 under the "dual status rule" is explained in its letter to the court of December 13, 2007. The amount which Nissan calculated is based on the difference between its proof of claim ($41,217.70) and the negative equity ($12,- 510). Although Nissan, in its letter to the court found this amount to be $28,717.70, this appears to be an arithmetical error which does not affect the result in this case. The correct amount, after using this formula, is $28,707.70.

*In re Hayes,* 376 B.R. 655 (Bankr. M.D.Tenn.2007).

The parties agree that there is no definition of a PMSI in the Bankruptcy Code, and in order to determine whether negative equity financing creates a non-PMSI, resort to applicable law—in this case, the State of Wisconsin—is required.

There are no state court decisions, to this court's knowledge, which have addressed this issue. However, Wisconsin has enacted Wis. Stat. § 409.103 (UCC–Secured Transactions)[4] which provides some guidance to the court.

Wis. Stat. § 409.103(2)(a) states that a security interest in goods is a PMSI to the extent the goods are "purchase money collateral" with respect to the security interest. "Purchase money collateral" is defined in Wis. Stat. § 409.103(*l*)(a) as "goods or software that secures a 'purchase money obligation' incurred with respect to that collateral." Wis. Stat. § 409.103(*l*)(b) states that a " 'purchase money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or for value given *to enable* the debtor to acquire rights in or the use of the collateral if the value is in fact so used" (emphasis added). The key words in this last quote are "to enable."

An analysis of these terms in Wis. Stat. § 409.103, when read in conjunction with each other, persuades this court that,

if a party finances the purchase of a new car by means of negative equity financing, the lender holds a PMSI for the full amount of its loan, which includes the entire negative equity. *Burt, Cohrs,* and *Peaslee II* all emphasize that Uniform Commercial Code Comment 3 supports this conclusion by its declaration that the terms "purchase money collateral" and "purchase money obligation" are essential to the description of a PMSI.[5] Comment 3 further states that the definitions of "purchase money obligation," "price of collateral," and "value given to enable" include obligations for expenses incurred in connection with acquiring rights in the collateral. Comment 3 then declares that "the concept of a 'purchase money security interest' requires a close nexus between the acquisition of collateral and the secured obligation."

*Burt* is similar to the case at bar in that both cases arise in states which do not have a statute defining "price" as including payment of the balance due on the trade-in vehicle. Despite the lack of such statute, *Burt* states that the terms "price" and "value given to enable" should be interpreted broadly to include negative equity from the debtor's trade-in vehicle. 378 B.R. at 362. *Burt* concludes by holding that negative equity is part of the PMSI and is therefore protected by the hanging paragraph. *Id.*

4. Wis. Stat. § 409.103 reads in part as follows:

**409.103 Purchase-money security interest; application of payments; burden of establishing.**

(1) DEFINITIONS. In this section:

(a) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral.

(b) "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(2) PURCHASE–MONEY SECURITY INTEREST IN GOODS. A security interest in goods is a purchase-money security interest:

(a) To the extent that the goods are purchase-money collateral with respect to that security interest. . . .

5. Comment 3 to § 9–103 of UCC also appears as a comment to Wis. Stat. § 409.103. *See* Wis. Stat. Ann. § 409.103 cmt. n. 3(2003).

*Cohrs* arrived at this same result by holding that the negative equity financing does not deprive the car lender's security interest of PMSI status. 373 B.R. at 110–11. *Cohrs* explained that, if the consumer purchaser used a portion of its loan to pay off the entire balance of the purchaser's old car without using the old car as a trade in, it result would have been different. *Id.* at 110. That did not happen in *Cohrs,* and it did not happen in the case at bar. In both *Cohrs* and the instant case, the old car was in fact used as a trade in for which credit was given on the purchase. It was an essential part of a single transaction which enabled the buyer to purchase the new vehicle.

In *Peaslee II,* the district court reversed the bankruptcy court and decided that negative equity financing did not deprive a secured lender of full protection under the hanging paragraph, stating the following:

> If the buyer and seller agree to include the pay off of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could not be viewed as such an expense.

> ——

> The fact that negative equity and trade-ins do not *have* to be included in the sale and that the buyer could in theory at least pay off the negative equity by other means, does not require a contrary result, if the facts surrounding the particular transaction at issue are such that the negative equity was integral to the sale.

373 B.R. at 259.

The holding in *Graupner* is in accord with *Burt, Cohrs,* and *Peaslee II. Graupner* was affirmed by the district court, which declared that negative equity is "inextricably intertwined with the sales transaction and the financing of the purchase"

and that the lender's PMSI remained fully secured. 2007 WL 1858291.

This court finds that the debtor and Nissan entered into a single transaction for the purchase and sale of a new car, utilizing negative equity financing as the method to accomplish this goal. The payment of the balance due on the trade-in car was a prerequisite to consummating this transaction. Without paying off the balance on the trade-in car, Russ Darrow Honda would have acquired a fully-encumbered vehicle and the $10,409 trade-in value afforded to the debtors would be illusory. There is a close nexus in this case between the acquisition by the debtors of the new car and the entire secured obligation, including the negative equity portion.

■ Nothing in BAPCPA declares that negative equity financing bars a secured lender from protection under the hanging paragraph. To the contrary, one of BAPCPA's goals was to afford additional protection for secured creditors and, primarily, for automobile lenders. *See Peaslee II,* 373 B.R. at 261 (citing cases which support the view that Congress, by enacting the hanging paragraph, intended to protect creditors from the abuse of cram down.) A recent law review publication authored by Professor William C. Whitford concluded, after reviewing BAPCPA's provisions affecting automobile lenders, that it is the automobile lenders who probably will benefit from BAPCPA more than most other creditor groups. William C. Whitford "A History of the Automobile Lender Provisions of BAPCPA" 2007 *U. Ill. L.Rev.* 143.

Rolling in the balance due on a trade-in vehicle as part of the amount financed for the purchase of a new vehicle is a common practice in the automobile industry, which clearly facilitates commerce. *Peaslee II,*

373 B.R. at 259. Wis. Stat. § 401.102(2)(b) declares that Uniform Commercial Code provisions are intended "to permit the continued expansion of commercial practices through custom usage and agreement of the parties." Wis. Stat. § 401.102(1) declares that the Uniform Commercial Code provisions "shall be liberally construed and applied to promote its underlying purposes and policies." These declarations are consistent with this court's conclusion that negative equity is part of Nissan's PMSI.

In addition, *In re Zehrung,* 351 B.R. 675 (W.D.Wis.2006), and *In re Wright,* 492 F.3d 829 (7th Cir.2007), have a bearing upon the issue before this court. Although *Zehrung* and *Wright* did not deal with negative equity financing, the courts analyzed the hanging paragraph with respect to the issue before them—namely, whether a secured creditor is entitled to assert an unsecured deficiency claim in a chapter 13 plan which provided for the surrender of the vehicle in full satisfaction of the claim. Both courts concluded that the secured creditors retained their rights to unsecured deficiency claims. In *Zehrung,* Judge Shabaz declared that the hanging paragraph was intended to expand the rights of secured creditors, not reduce them. 351 B.R. at 678. In *Wright,* the Seventh Circuit Court of Appeals stated that the debtor cannot write off the unsecured balance of the claim and that the hanging paragraph leaves the parties to their contractual entitlements. 492 F.3d at 832. The logic employed by these courts in interpreting the hanging paragraph is what is relevant here.

This court declines debtors' invitation to invoke the "dual status rule." Under the facts of this case and in light of the close nexus between debtors' acquisition of the new car and the negative equity financing enabling them to purchase this new car, negative equity financing is entitled to be included as part of the PMSI.

### CONCLUSION

The use of negative equity financing by the parties in connection with the purchase and sale of the new car did not destroy the purchase money nature of Nissan's security interest. Nissan holds a PMSI for the full amount due it from the debtors and is protected against cram down by virtue of the hanging paragraph.

Debtors' objection to Nissan's proof of claim is **OVERRULED,** and Nissan's objection to confirmation of debtors' proposed plan is **SUSTAINED,** without prejudice to debtors' right to file an amended plan.

This constitutes the court's findings of fact court and conclusions of law pursuant to Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure.